**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

**CITIBANK, N.A. AS TRUSTEE FOR AMERICAN**
**HOME MORTGAGE ASSETS**
**TRUST 2006-3, MORTGAGE BACKED PASS-THROUGH**
**CERTIFICATES SERIES 2006-3**

> **VS**                                          **Ca. No. 18-cv-427JJM**

**KATHERINE L. CAITO**

> **MEMORANDUM  OF LAW IN SUPPORT OF DEFENDANT'S MOTION**
> **FOR SUMMARY JUDGMENT**

This matter is before the Court on Plaintiff's Motion  for Summary Judgment in a

Judicial Foreclosure action.

This case is before the Court in a Judicial Foreclosure case pursuant to R.I.G.L

34-27-1. This action was by an entity known as Citibank, N.A. as Trustgee for American Home

Mortgage Assets Trust 2006-3, Mortgage Backed Pass-through Certificates Series 2006-3.  In

order to prevail in a foreclosure action, the Plaintiff must prove the following:

1.      That it is a securitized trust of which Citibank, N.A. is the Trustee

2.      That it is  the owner and holder of the note.

3.      The note was transferred to it pursuant to the Uniform Commercial Code.

4.      The Note was not lost

5.      That it has been assigned the mortgage.

6.      That it has strictly complied with the terms of the mortgage by mailing the borrower a

default notice pursuant to the terms of the mortgage.  In order to strictly comply with paragraph

22 and paragraph 9 of the mortgage, the Default letter must indicate:

a.      a specific date to cure at least 30 days after the date the letter is deposited in the mail;

1

b.      an accurate amount of default stated;

c.      no conditions that the default must be paid by certified funds unless the borrower has

provided insufficient funds;

d.      that failure to cure the specific amount stated to be in default on or before the specific

date designated to cure may result in acceleration and sale;

e.      that the borrower has the right to reinstate after acceleration, but no later than 5 days

before the sale date;

f.      that the borrower has the right to bring a court action to assert the non existence of

default or any other defense to acceleration and sale.

Strict compliance with the terms of the mortgage prohibit this notice from imposing any other terms. For example, the amount to cure must be definite and cannot include the language that the borrower should contact the servicer to get the exact amount. After the default of the specific and accurate arrearage amount is not cured, the lender or the assignee must accelerate the mortgage loan with an accurate amount. Failure to indicate either an accurate amount for the arrearage to be cured or the purported accelerated amount renders  the action void for failure to meet the conditions of the terms of the mortgage.

**THE PLAINTIFF DOES NOT EXIST UNDER THAT NAME AND CANNOT PROCEED AS A PLAINTIFF SINCE THIS TRUST DOES NOT EXIST UNDER THIS NAME**

Plaintiff contends that due to prior litigation and a release from the Defendant that

she cannot challenge the ownership of the loan. The Plaintiff contends that this release signed by

Citibank as Trustee establishes that it is the owner.  However the records of the Securities and

Exchange Commission clearly establish that there is no entity with this name. The Court can take

judicial notice of the following certified copies of documents from the Securities and Exchange

Commission which establish that there is no trust with this name. The Defendant has provided

certified copies of records of the Securities and Exchange Commission regarding an actual trust

with the name of American Home Mortgage Assets Trust 2006-3.  These three clearly indicate

that this is the name of the trust, not the name of the entity which purportedly was assigned the mortgage.  The fact that the  Defendant signed a settlement agreement with Ocwen, which also signed on behalf of the nonexistent entity, does not create jurisdiction in this Court for a nonexistent entity to file a lawsuit.  In addition, Citibank as Trustee for American Home Mortgage Assets Trust 2006-3 filed suit in United States District Court for the Northern District of Texas seeking damages against a mortgage insurance carrier. This document indicates the exact name of this trust, which along with the other certified documents from the Securities and Exchange Commission.

Defendant agreed that Citibank was the Trustee for the trust which owned her loan. However the burden of proof lies with the Plaintiff to prove that this Trust exists under this name. It could seek to amend the complaint, but then would have to prepare and record a corrective assignment. The Plaintiff does not dispute that there is a trust which owns her mortgage loan, but suggests that Plaintiff has not met its burden of proof to demonstrate that this improperly named trust owns her loan. In the filing by Plaintiff today in response to the Motion for Summary Judgment filed by the Defendant, this Plaintiff merely stated that the mortgage was assigned to Citibank, N.A.as trustee, ignoring the language of the assignment.

**THE PLAINTIFF HAS FILED A COMPLAINT BASED ON A NOTE AND MORTGAGE WHICH HAVE BEEN MODIFIED BUT HAS NOT BEEN REFERENCED IN THE PLEADINGS OR THE MOTION FOR SUMMARY JUDGMENT AND ITS PURPORTED SUPPORTING AFFIDAVIT**

The Plaintiff has filed an amended complaint which  bases its entire case on three documents, the mortgage, the Note and the purported default notice. However the Plaintiff has ignored and not even mentioned a crucial material fact, namely that the Defendant and the

3

servicer for the original mortgagee shortly after origination of the mortgage loan executed a

Mortgage Modification Agreement.  This agreement is referenced in Defendant's Affidavit as

Exhibit A-4.  Furthermore, the affidavit on its face ignores the fact that the Defendant's

mortgage and note were modified and the mortgage payments were not calculated accurately.

Plaintiff's Exhibit B, which was attached to the complaint was recorded on June 6, 2006 in the

Land Evidence Records of the Town of Westerly. This document contained a different

Adjustable Rate Mortgage rider than the one as to which Defendant should have been charged

since origination. This adjustable rate rider on the Defendant's  mortgage contained  a different

adjustable rate than her loan was processed for based on the disclosures for this loan. The

recorded mortgage indicates that the mortgage adjustable rate would be calculated at 3.5%  in

percentage points to be added to the Current Index. The Current Index was defined in the Note

and Mortgage as the Twelve-Month Average  of the annual yields on actively traded United

States Treasury Securities adjusted to a constant maturity of one year as published by the Federal

Reserve Board in the Federal Reserve Statistical Release.   However effective June 6, 2006, the

Plaintiff signed a modification agreement which provided for a different rate than the rate in the

promissory note and the mortgage. This accurate rate consisted of 3.125% in percentage points to

be added to the Current Index. This change was created by a Mortgage Modification Agreement,

which agreement was signed by her and by American Home Mortgage, the original loan servicer.

This document was recorded in the Land Evidence Records of the Town of Westerly  on October

23, 2006 in Book 1581 Page 329.   A genuine and authentic copy of this Modification

Agreement is attached as Exhibit A-4.

Thus all the calculations of the Ocwen records and the allegations of the Plaintiff in this complaint are wrong. Based on the original principal balance of $4,500,000.00, the change in the calculation of the interest rate by reducing the percentage which was added to the Current Index equaled .375  from origination of the mortgage loan until the present. Since July 1, 2006, the interest rate on her mortgage has been calculated at the Current Index plus 3.5%. The last loan change report from  Ocwen is attached as Exhibit A-5. This exhibit is a genuine and authentic copy of the Mortgage Interest Rate and Monthly Payment change mailed to her, through her attorney.

Due to her mortgage being a negative amortization mortgage, the principal balance of the mortgage increased to an amount greater than $4,500,000.00.  However based on a simple calculation of .375% for each year from the date of the first mortgage payment, which accrued interest since July 1, 2006, there have been thirteen years of inaccurate interest calculations of her mortgage in the minimum amount of $16,875.00 per year. As a result, the amount charged for excess interest over thirteen years exceeds $219,375.00 at the current time. The Plaintiff's affidavit makes no mention of the fact that her mortgage and note were modified by American Home Mortgage. The purported Affidavit in support of the Motion for Summary Judgment referenced an inaccurate default letter and inaccurately stated the amount of principal and interest due and miscalculated the late charges due based on the incorrect percentage (3.5%) added to the Current Index contrary to the terms of the modified mortgage and note.

 The complaint seeks to judicially foreclose without referencing a crucial document, the Mortgage Modification Agreement, which changed the terms in crucial financial ways as well as in regard to the percentage added to the Current Index. For example the original mortgage

5

indicated that starting with the August 1, 2006 payment the mortgage interest rate would be 7.782% until the  first change date of September 1, 2006.  Thus this mortgage granted to the Defendant provided for a teaser rate of 1.75% for less than one month and a 7.782% rate for one month. After that the index would be calculated based on the 3.5% plus the current index. This Court should take judicial notice of the fact that for the year 2006, the highest yield for these securities was 5.3% with an average of 5%.  This resulted in an interest rate higher than the 7.782% required for the period until August 1, 2007 under the terms of the modification.  Thus for the first year the overcharge for interest was $25,560.00 and each subsequent year was $16,875.00.

The Plaintiff did not address this issue of the actual amount of the loan balance. It unbelievably stated in its affidavit for Summary Judgment:

According to Ocwen's records, as of May 14,2019**, approximately** $4,622,474.40
is due and owing in principal, $1,350,190.85 is due and owing in interest, and $210,438.82 is due and owing in escrow payments on the Borrower's mortgage loan.(emphasis added)

Another genuine issue of material fact which has not been proven by the Plaintiff arises from the fact that the original mortgage provided that there was a cap either way for calculation of the monthly payment of principal and interest. The original mortgage provided that on the 0 anniversary of the due date of the first monthly payment and on that same day every 0 years, the monthly payment will be adjusted without regard to the payment cap limitation in Section 4(F). In other words, the payment was limited to a 7.5% annual increase or decrease. The modified mortgage however provided that the borrower would have that protection for 5 years.  The failure to provide that protection which the modification provided for 5 years, thus increased the Defendant's mortgage payment for the first five years without this protection. This Plaintiff is

filing a Judicial Foreclosure and it does not have the exact amount due on the note. It utilized the wrong formula and time frame to calculate payments while it was the servicer and cannot with any degree of certainty or specificity indicate the actual amount of the mortgage balance or interest.

This Memorandum of law also addresses issues raised by the recent First Circuit case of *Thompson v. JPMorgan Chase Bank, N.A*. CA. No. 18-1559, which was decided on February 8, 2019 and set forth relevant requirements for strict compliance with the terms of the mortgage, which were not complied with in this case.  In *Thompson*, the First Circuit reversed the dismissal by the District Court and reversed a foreclosure sale due to the fact that the purported default notice failed to notify the mortgagor of the limitations of the right to reinstate. The Court held that due to the strict compliance required under Massachusetts law and the obligation not to provide language in the notice which was deceptive, the failure to advise the mortgagor that reinstatement could occur no later than five days before the scheduled sale was fatally defective. It also held that there was no need to demonstrate prejudice arising from said failure to notify the mortgagor.

The cases of *Martins v. FHFA* et al 214 F.Supp.3d 163 (D. R.I., 2016)  and *Dan Harry v. PNC Bank C.A. No. 17-136 WES* (D.R.I., February 26, 2018) have restated pre-existing and established  Rhode Island law, which  mandated that mortgage contracts must be strictly complied with in order to exercise the statutory power of sale.   Failure to do comply with the conditions precedent contained in paragraph 22 of the mortgage would thus invalidate any subsequent foreclosure.  . This Court in *Dan Harry* held that strict compliance was required and noted that the Rhode Island Supreme Court in *Bucci v. Mortgage Electronic Registration*

*Systems, Inc.* 68 A. 3d 1069(R.I., 2013) had interpreted Rhode Island mortgages applying

Massachusetts case law due to the similarities of the statutes authorizing statutory power of sale:

> Also pertinent is that the Rhode Island Supreme Court's decisions regarding mortgage interpretation turn to Massachusetts case law to fill in the interstices in Rhode Island mortgage jurisprudence. See Cruz v. Mortg. Elec. Registration Sys, Inc., 108 A.3d 992, 997 (R.I. 2015) (looking to guidance from Massachusetts to develop law pertaining to standing to challenge mortgage assignments) (citing as guidance Wilson v. HSBC Mortg. Servs., Inc., 744 F.3d 1 (1st Cir. 2014) (applying Massachusetts law)); Bucci, 68 A.3d at 1087 ("we interpret the term `mortgagee' in our statutes in a similar fashion as did the Supreme Judicial Court of Massachusetts") (citing as guidance Culhane v. Aurora Loan Servs. of Neb., 826 F. Supp. 2d 352 (D. Mass. 2011) (applying Massachusetts law), aff'd, 708 F.3d 282 (1st Cir. 2013), and Eaton v. Fed. Nat'l Mortg. Ass'n, 969 N.E. 2d 1118 (Mass. 2016)). Accordingly, it is appropriate for this Court to consider persuasive the relevant mortgage-law guidance from Massachusetts. See, e.g., Jose, 54 N.E. 3d at 1132 & n.3 (claim that foreclosure may be rendered invalid by mortgagee's failure to conduct pre-foreclosure face-to-face meeting survives summary judgment); Cook, 31 N.E. 3d at 1131 (mortgagor's claims to restore title and avoid eviction based on mortgagee's failure to comply with HUD regulations before foreclosing survive summary judgment).a

In *Martins*, the Court held that strict compliance with the provisions of

paragraph 22 applied to nonjudicial foreclosures and judicial foreclosures:

> Despite the fact that the judicial foreclosure statute, R.L GEN. LAWS § 34-11-22, does not expressly require compliance with the Mortgage document, the Rhode Island Supreme Court has stated that "the right to exercise the power of sale in a mortgage is derived from contract, not statute," and that the power of sale "does not exist independently" from the mortgage agreement. *Bucci v. Lehman Bros. Bank, FSB,* 68 A.3d 1069, 1084, 1085 (R.I. 2013). Simply put, if a mortgagee agrees to give a certain notice before a foreclosure, it does not matter whether it is a judicial or non-judicial foreclosure. The mortgagee must do that which it agreed. Thus, this Court must review compliance with Paragraph 22 of the Mortgage as a matter of contract law, irrespective of whether Defendants are seeking judicial or non-judicial foreclosure. *Martins* at p.169,.

In view of the strict compliance requirement for all conditions precedent to foreclosure,

*Thompson* is clearly applicable to Rhode Island Law.  In *Thompson*, the First Circuit held:

> The mortgage terms for which Massachusetts courts demand strict compliance include the provisions in paragraph 22 requiring and prescribing the pre-foreclosure default notice.

you can still avoid foreclosure by paying the total past-due amount before a foreclosure sale takes place"—could mislead the Thompsons into thinking that they could wait until a few days before the sale to tender the required payment.

Since Rhode Island law as established by case law in this District also imposes strict compliance, any analysis in *Thompson*, applies to Rhode Island mortgage cases.  Thus the Court's analysis of the interplay between paragraph 19 and paragraph 22 of the mortgage clearly apply to this case.  Paragraph 19 clearly states that a borrower has up to five days prior to the sale date to reinstate the mortgage loan, which had been accelerated by curing the arrearage.  In *Thompson*, the default letter had deceptively advised the mortgagee about the right to reinstate without providing the mortgagee the information that this right ended five days before the sale. Here a similar notice, which omitted the paragraph 19 limitation was given to the Defendant.

## THE MAY 11, 2018  NOTICE DID NOT STRICTLY COMPLY WITH THE TERMS OF THE MORTGAE AND LACKED A SPECIFIC DATE TO CURE

Paragraph 22 of the mortgage provides that the Lender must send a notice of default which contains specific language as a condition precedent to acceleration and sale. However Defendant never received any valid default letter from the owner of the note and the mortgage or an agent indicating that it was acting on behalf of the owner of the note and the mortgage. Certain provisions of paragraph 22 of the mortgage were required to be complied with before acceleration of the loan was declared. The Owner of the Note and the Mortgage was required to specify:

a.      the default;

b.      the action required to cure the default, stating a date, not less than 30 days from the date the default must be cured;

9

    c.      that failure to cure the default on or before the date specified in the Notice may result in the acceleration and the right to bring a court action to asset the non-existence of a default of Borrower to acceleration and sale.

Paragraph 22 of the mortgage, which contains conditions for the exercise of

the statutory power of sale, reads as follows:

> **Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the STATUTORY POWER OF SALE and any other remedies permitted by Applicable Law.  Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

> **If Lender invokes the STATUTORY POWER OF SALE, Lender shall mail a copy of a notice of sale to Borrower as provided in Section 15.  Lender shall publish the notice of sale, and the Property shall be sold in the manner prescribed by Applicable Law. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.**

A review of the Defendant's mortgage indicates that the following notice, dated May 11,

2018, attached to the Plaintiff's complaint as Exhibit D and contained the following language,

which is not compliant with the terms of the mortgage and established Rhode Island law:

Mortgage payments on the above referenced account are past due, which has caused a default
under the terms of the Mortgage or Deed of Trust(hereinafter, "Security Instrument.") As of
5/11/2008, the following amounts are past due:

| | |
|---|---|
| Principal and interest | $1,7555,311.72 |
| Interest arrearage | $0.0 |
| Escrow | $419,235.00 |
| Late charges | $21,282.05 |
| Insufficient funds charges | 0.00 |
| Fees/expenses | $6,086.49 |
| Suspense balance (Credit) | 0.00 |
| Interest Reserve balance | 0.00 |
| TOTAL DUE | $$2,201,915.26 |

In order to cure the default, payment for the total amount past due, plus any amount(s) becoming
due in the interim, must be received on or before 06/17/2018, at the address listed on page four
of this notice. Payment must be received by MoneyGram, bank check, money order or certified
funds. Please be aware, after acceleration of the debt, there may be expenses and attorney's fees
and costs incurred by us to enforce the terms of the Security instrument or mortgage agreement,
in addition to the overdue amount of the mortgage account. Any payment to reinstate the
mortgage after acceleration must therefore include an amount sufficient to cover such expenses
and fees incurred. Payments received that are less than the amount sufficient to cover such
expenses and fees incurred. Payments received that are less than the amount required to reinstate
the Mortgage will be returned, and will not stop any foreclosure proceedings already begun on
the Property.

**PRIOR TO SUBMITTING A PAYMENT, PLEASE CALL US TO VERIFY THE EXACT AMOUNT PAST DUE ON THE ACCOUNT**

Failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by the Security Instrument and sale of the Property. Upon acceleration, the total obligation will be immediately due and payable without further demand. In foreclosure proceedings, we are entitled to collect the total arrearage in addition to any expenses of foreclosure including but not limited to reasonable attorney's fees and costs. A customer has the right to reinstate the account after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense to acceleration and sale.

If the default is not cured on or before the date specified above, Ocwen Loan Servicing, LLC ("Ocwen"), at its option may require immediate payment in full of all sums secured by the Security Instrument without further demand and may invoke the STATUTORY POWER OF SALE and any other remedies permitted under Applicable Law. Ocwen shall be entitled to collect all expenses incurred in pursuing the remedies provided under applicable law, including, but not limited to, reasonable attorney's fees and costs of title evidence. If Ocwen invokes the STATUTORY POWER OF SALE,  Ocwen shall mail a copy of a notice of sale to  the customer and to other persons in a manner prescribed by applicable law. . .If the mortgage account cannot be brought current, we should be contacted immediately do discuss possible alternatives to foreclosure.  We want to help remedy the delinquent status of this account and would like to discuss alternatives that might be available, While our primary objective is the collection of past due amounts on the account, we want to work to find the best available alternative to bring the account current. . . For any questions of concerns, we can be reached toll-free at 800.746.2936. We available Monday through Friday 8 am to 9pm and Saturday 8 am to 5 pm ET.

Daniel Robbins has been assigned as your relationship manager and will be your designated representative for resolution inquiries and submission of documents.

Sincerely, Loan Servicing
**TOLL FREE PHONE**: 800.746.2936

The last page of the notice provided a form for Payment Remittance Information. This

form indicated again that payment had to be made by certified funds and indicated the only

manner in which payment of the arrearage could be made:

Western Union
 Money Gram,
Mail a Money Order/Certified Check
Bank Wire

Instructions were provided for all of these designated method of  payment.

12

A review of this notice indicates that it was defective.  It did not reference a specific date for the Defendant to cure the arrearage. Rather the letter stated that the arrearage had to be cured on or before June 17, 2018. Thus there was no specific date to cure as the phrase on or before includes every date from the date of the letter until June 17, 2018.  The notice did not specify a particular date, by which the cure amount had to be paid or face acceleration by Ocwen Loan Servicing and sale of the mortgaged premises. No person could determine from the letter the actual date on which to cure. This letter was deceptive because it did not specify an exact date to cure, only a range of dates from the date of the letter until June 17, 2018.  Thus there was not strict compliance with the terms of the mortgage as required by Rhode Island as developed in regard to contracts and notices, which are conditions precedent to the exercise of certain contractual rights.

Rhode Island contract law is quite specific in this regard. There was not strict compliance with the terms of the contract, which was a condition precedent at indicated in the case of *Cinq-Mars v. Travelers Ins. Co.,* 218 A.2d 467, 471 (R.I. 1966). In that case, the Court interpreted an insurance contract and held:

It is, of course accepted law that compliance with such a policy condition is a condition precedent to an insurer's liability. Sherwood Ice Co. v. U.S. Casualty Co., 40 R.I. 268; 8 Appleman, Insurance Law & Practice, § 4732, p. 7.

In the  case of *Commerce Park Village Green v. Vito Vitone,* KD-2-11-1029 (Superior Court, September 22, 2016), Justice Rubine reviewed a notice provision as a criterial for an eviction:

  The Tenant claims that the Landlord was required to serve the Tenant with a "proper move out or vacate notice" before a complaint for eviction may commence, as well as before the holdover provision of the Lease may be invoked. Defective notice under the statute is jurisdictional, and this Court has no jurisdiction to consider a complaint absent strict compliance with the notice

13

provisions of the statute. See, *Hedco Ltd. v. Blanchette,* 763 A.2d 639 (R.I. 2000); see also, *Abbenante v. Giampietro*, 75 R.I. 349, 66 A.2d 501 (1949). The purpose of notice is to advise the tenant of the reason for eviction, and provides an opportunity to cure prior to the commencement of an eviction action. Proper notice also affords the tenant a reasonable opportunity to secure alternative housing before an eviction action is commenced.

In the case of *Haviland v. Simmons,* 45 A.3d 1246 (R.I., 2012), the Rhode Island

Supreme Court decided that if there was any ambiguity in a contract, that such issue had to be

resolved at trial:

Where an ambiguity exists in a provision of a contractual 1259*1259 document, the construction of that provision is a question of fact."*Fryzel v. Domestic Credit Corp.,* 120 R.I. 92, 98, 385 A.2d 663, 666 (1978) (citing*Geary v. Hoffman,* 98 R.I. 413, 417, 204 A.2d 302, 305 (1964); *Russolino v. A. F. Rotelli & Sons,* 85 R.I. 160, 163, 128 A.2d 337, 340 (1957)). We are of the opinion that, although an express agreement was entered into, based on our review of the contract in its entirety, an ambiguity exists concerning the terms of the agreement relative to the standard under which Haviland's reappointment is to be evaluated.
*Haviland*, at pp. 1258-1259

The language in the mortgage, which was a condition precedent was not complied with by the

Plaintiff.

In the case of *Abbenante v. Giampietro,* 75 R.I. 349, 353, 66 A.2d 501, 503 (1949),  the

Supreme Court review a notice case in which a specific date was not provided for a Notice to

Quit. A question existed as whether the tenant had to quit on the next day after his tenancy

terminated on February 29, 1949. The Court  held:

We are unable to agree with this contention. If plaintiffs were demanding the premises freed of the existing tenancy at $25 a month defendant was entitled to an **unequivocal** notice to quit on the day next succeeding the last day of such tenancy.

Thus the Court held that in a Notice case, for a notice to be effective it had to be unequivocal as

to the time of compliance, which did not occur in this case.

In the case of *Hedco v. Blanchette*, 763 A. 2d 639 (R.I., 2000), the Rhode Island

Supreme Court upheld this principle when it held:

14

In considering the sufficiency of a termination notice, we have repeatedly stated [**8] that "the important factor is whether the statute has been complied with and not whether the tenant has been misled by the notice given." _Tate v. Peter Charles Reynolds, Inc.,_ 622 A.2d 449, 450 (R.I. 1993) (per curiam) (citing _De Luca v. Cinima,_ 72 R.I. 346, 350, 51 A.2d 369, 370-71 (1947)). Although a tenant may be clearly apprised of the termination of his lease, we have determined a notice to be fatally defective when it ordered the tenant to quit on the last day of his term instead of the first day following it, _Industrial Trade Unions of America v. Metayer,_ 69 R.I. 199, 203, 32 A.2d 789, 790-91 (1943), or when it did not clearly indicate that an agent was acting on behalf of the landlord. _Tate,_ 622 A.2d at 450.

The Court held:

Because service of a valid and proper notice to quit is a condition precedent to maintaining a trespass and ejectment action, plaintiff failed to properly invoke the jurisdiction of the court. _See Abbenante v. Giampietro,_ 75 R.I. 349, 353, 66 A.2d 501, 503 (1949) (holding that [HN8] tenancy is not terminated without proper notice, regardless of landlord's intention).

Thus the Court held that in a Notice case, for a notice to be effective it had to be unequivocal as to the time of compliance, which did not occur in this case. After all the use of on or before June 17, 2018 is not an unequivocal date for paragraph 22(b) purposes.

This Court in _Martins v. Federal Housing Finance Agency_, No. 15-cv-235-M-LDA followed established Rhode Island law and held that strict compliance was required for paragraph 22 notices just like any other contracts. _Martins_ involved a Judicial Foreclosure in Federal Court. The Court held:

In Rhode Island, if a contract contains a notice requirement, then a court construes that notice requirement as a condition precedent, which requires strict compliance. _Cinq-Mars v. Travelers Ins. Co.,_ 218 A.2d 467, 471 (R.I. 1966) (requirement of written notice for a claim by the insured is a "condition precedent to the insurer's liability."); _Ins. Co. of N. Am. v. Kayser-Roth Corp.,_ No. C.A. PC 92-5248, 1999 WL 81366, at *22 (R.I. Super. July 29, 1999) (stating that notice requirements are a condition precedent in insurance contracts); _Dyer v. Ryder Student Transp. Servs., Inc.,_ No. 98-4489, 1999 WL 395417, at *2 (R.I. Super. June 7, 1999) ("If notice by a tenant is not given to a landlord in accordance with the terms of the lease, the right to renew has been lost or has lapsed. . . .").

Furthermore, Paragraph 22 of the Mortgage is a condition precedent, which requires strict compliance, when a mortgagee seeks acceleration and foreclosure. _In re Demers,_ 511 B.R. 233, 238, 239 (Bankr. D.R.I. 2014) (holding that a notice omitting a borrower's right to go to court to

15

contest acceleration was fatal, and that even if notice to go to court was ambiguously provided, that ambiguity must be construed against the drafter).

*Martins* was quite specific:

Defendants now seek to foreclose on the Property through an order from this Court, instead of non-judicially. The change of process for the foreclosure, however, does not alleviate compliance with the agreement they made in the Mortgage, including the Paragraph 22 notice requirements. Despite the fact that the judicial foreclosure statute, R.I. GEN. LAWS § 34-11-22, does not expressly require compliance with the Mortgage document, the Rhode Island Supreme Court has stated that "the right to exercise the power of sale in a mortgage is derived from contract, not statute," and that the power of sale "does not exist independently" from the mortgage agreement. *Bucci v. Lehman Bros. Bank, FSB,* 68 A.3d 1069, 1084, 1085 (R.I. 2013). Simply put, if a mortgagee agrees to give a certain notice before a foreclosure, it does not matter whether it is a judicial or non-judicial foreclosure. The mortgagee must do that which it agreed. Thus, this Court must review compliance with Paragraph 22 of the Mortgage as a matter of contract law, irrespective of whether Defendants are seeking judicial or non-judicial foreclosure.

The Court granted Summary Judgment to the homeowner stating:

There is no genuine issue as to any material fact concerning whether Fannie Mae complied with the Mortgage Agreement. It did not. At the least, the notices failed, on their face, to specify an exact date by which Ms. Martins could cure default, that she could reinstate the loan after acceleration, and that she has a right to bring court action. With respect to these elements of the notice, there is no plausible way that a jury could find for Defendants, and the notice is indeed material, as it determines whether Defendants have complied with the Mortgage Agreement.

Defendant makes the same argument in this case as in *Martins,* particularly as to

the date of the cure.  .

Judge Finkle of the Rhode Island Bankruptcy Court in the case of *In Re Demers*, 511

B.R. 233 (Bankr R.I., 2014) analyzed Rhode Island law and found that strict compliance with

paragraph 22 of a mortgage was a condition precedent to acceleration and sale. In *Demers,* the

Court considered a Proof of Claim filed by Wells Fargo through its servicing name of America's

Servicing Company.  A notice  was sent to the Debtor/mortgagor prior to a foreclosure, which

was stopped by the Debtor's Chapter 13 bankruptcy filing.  The Court found that strict

compliance with Paragraph 22 of the mortgage was a condition precedent to acceleration and

exercise of the statutory power of sale under Rhode Island law.  The Court held:

> Reading the Note and Mortgage as an integrated contract, I find the loan agreement
> between Ms. Demers and ASC is unambiguous and ASC's compliance with Mtg.
> Paragraph 22 is a condition precedent to its right to accelerate the Note and pursue its
> remedy of foreclosure against the Property. That paragraph, in plain and ordinary terms,
> states that prior to accelerating the Note ASC is required to give Ms. Demers notice of
> "the right to bring a court action to assert the non-existence of a default or any other
> defense of Borrower to acceleration and sale." The Notice without question did not
> inform Ms. Demers that she had a right to bring an action in court. Quite clearly the
> Notice did not comply with this prerequisite.
> Even so, if I were to determine that the loan agreement read as a whole is "reasonably
> and clearly susceptible of more than one interpretation" and potentially ambiguous based
> upon an arguable inconsistency among Note Paragraph 7 and Mtg. Paragraphs 14 and 22,
> I would still conclude that under the loan agreement ASC is not entitled to recover the
> Disputed Charges. Any ambiguity in a contract "must be construed against the drafter of
> the document," in this case ASC (or its predecessor-in-interest). *Haviland,* 45 A.3d at
> 1260 ( *quoting Fryzel,* 385 A.2d at 666-67). Furthermore, "virtually every contract
> contains an implied covenant of good faith and fair dealing between the
> parties." *Dovenmuehle Mortg., Inc. v. Antonelli,* 790 A.2d 1113, 1115 (R.I.2002). I see
> no reason this loan transaction should be exempted from this general rule. Indeed, in a
> transaction such as this between an individual homebuyer and a mortgage lender, there is
> an imbalance of power such that the more powerful and sophisticated party, ASC, must
> be held to this standard of good faith and fair dealing.

The Court analyzed the purpose of the provision as a condition and held that:

Notice provisions in mortgage documents usually require default notices to contain specific
information, which serves a very clear and specific purpose; it informs mortgagors of their rights
so that they may act to protect them. Therefore, when the terms of the note and mortgage require
notice of default, proper notice is a condition precedent to an action for foreclosure.
For unexplained reasons, the Notice sent by ASC upon Ms. Demers' 2012 default deviated from
these prior notices and omitted this contractually mandated notice provision. This defect resulted
in the invalidity of the foreclosure process ASC pursued and precludes recovery of its associated
costs.

17

The Massachusetts Supreme Judicial Court  analyzed this type of notice in exactly the same manner.  In the case of *Pinti v. Emigrant Mortgage Company*, No. SJC-11742 (Ma., July 17, 2015), the Court invalidated a foreclosure where there was not strict compliance with the provisions of paragraph 22.  The Court commenced by viewing the extraordinary power that a mortgagee possessed when non-judicial foreclosure commenced with no judicial intervention:

This court has recently reemphasized the point that in light of "the substantial power that the statutory scheme affords to a [mortgagee] to foreclose without immediate judicial oversight, we adhere to the familiar rule that `one who sells under a power [of sale] must follow strictly its terms'"; the failure to do so results in "no valid execution of the power, and the sale is wholly void." Ibanez, 458 Mass. at 646, quoting  Moore v. Dick, 187 Mass. 207, 211 (1905). See  Pryor v. Baker, 133 Mass. 459, 460 (1882)("The exercise of a power to sell by a mortgagee is always carefully watched, and is to be exercised with careful regard to the interests of the mortgagor"). This is true with respect to terms that are connected to the power of sale contained in the mortgage instrument itself, [10] and to terms contained in § 21, the statutory power of sale, or in one of "the statutes relating to the foreclosure of mortgages by the exercise of a power of sale" to which § 21 refers.

It then proceeded to analyze the nature of the Paragraph 22 notice:

Insofar as the plaintiffs' mortgage is concerned, paragraph 22 begins by requiring notice of default to be given prior to any acceleration of the sums secured by the mortgage; then specifically prescribes the contents of the notice of default; and then provides that, if the default is not cured before the date specified in the notice, the mortgagee may invoke the statutory power of sale (as well as pursue other remedies). As the paragraph is written, therefore, the sending of the prescribed notice of default is essentially a prerequisite to use of the mortgage's power of sale, because the power of sale may be invoked only if the default is not cured within the time specified in the notice of default. In this regard, we agree with the plaintiffs that the "terms of the mortgage" with which strict compliance is required — both as a matter of common law under this court's decisions and under § 21 [15] — include not only the provisions in paragraph 22 relating to the foreclosure sale itself, but also the provisions requiring and prescribing the preforeclosure notice of default. See  Foster, Hall & Adams Co., 213 Mass. at 322-324.

The Court then concluded by holding:

> this court's decisions about mortgage terms indicate that by structure and content, the notice of default required to be given under paragraph 22 is integrally connected, and operates as a prerequisite, to the proper exercise of the mortgage instrument's power of sale. Emigrant's strict compliance with the notice of default required by paragraph 22 was

18

necessary in order for the foreclosure sale to be valid; Emigrant's failure to strictly comply rendered the sale void.

Thus the *Pinti* case supports Plaintiff's position that the notice was void and defective because it did not strictly comply with the terms of the mortgage.

The language of the purported default notice is defective on its face. There are two relevant portions of paragraph 22. The first is 22(c) which requires language which indicates: **a date,** not less than 30 days from the date the notice is given to Borrower, by which the default must be cured. The second is 22(d) which states that failure to cure the default **on or before the date specified** in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. This notice used the paragraph 22(d) provision for the paragraph 22(c) provision. As a result, there was no specific date in 22(c) and the on or before provision of 22(d) had no specific date to reference from paragraph 22(c).  On or before June 17, 2018 is not a specific date to cure which could be referenced in 22(d). Effectively this notice stated that the Defendant had to cure at any date before June 17, 2018, which included  thirty different dates within thirty days of the letter. Thus this letter was defective on those grounds alone, rendering this action subject to dismissal. There is no genuine issue of material fact as this notice could not satisfy the strict compliance standard of Martin and Thompson and the existing Rhode Island case law. Plaintiff chose to proceed without a specific default letter as this Court found in the notice sent out by Ocwen in the case of *Camarena v. Ocwen Loan Servicing*, et al 18-cv-132JJM-LDA.  Exhibit 1 attached to this memorandum is the notice sent in that case, in which Ocwen Loan Servicing, LLC stated:

DEMAND is hereby made against you to cure this default by July 3, 2016.

This notice was not sufficient to allow for a Temporary Restraining Order.

19

The on or before time frame for each notice mandated cure on a series of unspecified

dates, some of which were within the thirty day period. Paragraph 22 provides that once a

specific date is set, only then can the notice state:

that failure to cure the default on or before the date specified in the
Notice may result in the acceleration of the sums secured by this Security Instrument and sale of
the property

Here the initial on or before language did not specify a particular date to

cure, which could be referenced in the required "on or before" section of

Paragraph 22.

Clearly supporting *Martins* and the notion of strict compliance, the  First Circuit in

*Thompson v. JPMorgan Chase Bank, N.A.* CA. No. 18-1559 was decided on February 8, 2019

set forth relevant requirements for strict compliance with the terms of the mortgage, which were

not complied with in this case.  In *Thompson*, the First Circuit reversed the dismissal by the

District Court and reversed a foreclosure sale due to the fact that the purported default notice

failed to notify the mortgagor of the limitations of the right to reinstate. The Court held that due

to the strict compliance required under Massachusetts law and the obligation not to provide

language in the notice which was deceptive, the failure to advise the mortgagor that

reinstatement could occur no later than five days before the scheduled sale was fatally defective.

It also held that there was no need to demonstrate prejudice arising from said failure to notify the

mortgagor.

*Martins and Dan Harry v. PNC Bank C.A. No. 17-136 WES* (D.R.I., February 26, 2018)

have restated pre-existing and established  Rhode Island law, which  mandated that mortgage

contracts must be strictly complied with in order to exercise the statutory power of sale.   Failure

to do comply with the conditions precedent contained in paragraph 22 of the mortgage would

thus invalidate any subsequent foreclosure.  The Court in *Dan Harry* held that strict compliance

was required and noted that the Rhode Island Supreme Court in *Bucci v. Mortgage Electronic

Registration Systems, Inc*. 68 A. 3d 1069(R.I., 2013) had interpreted Rhode Island mortgages

applying Massachusetts case law due to the similarities of the statutes authorizing statutory

power of sale:

> Also pertinent is that the Rhode Island Supreme Court's decisions regarding mortgage interpretation turn to Massachusetts case law to fill in the interstices in Rhode Island mortgage jurisprudence. See Cruz v. Mortg. Elec. Registration Sys, Inc., 108 A.3d 992, 997 (R.I. 2015) (looking to guidance from Massachusetts to develop law pertaining to standing to challenge mortgage assignments) (citing as guidance Wilson v. HSBC Mortg. Servs., Inc., 744 F.3d 1 (1st Cir. 2014) (applying Massachusetts law)); Bucci, 68 A.3d at 1087 ("we interpret the term `mortgagee' in our statutes in a similar fashion as did the Supreme Judicial Court of Massachusetts") (citing as guidance Culhane v. Aurora Loan Servs. of Neb., 826 F. Supp. 2d 352 (D. Mass. 2011) (applying Massachusetts law), aff'd, 708 F.3d 282 (1st Cir. 2013), and Eaton v. Fed. Nat'l Mortg. Ass'n, 969 N.E. 2d 1118 (Mass. 2016)). Accordingly, it is appropriate for this Court to consider persuasive the relevant mortgage-law guidance from Massachusetts. See, e.g., Jose, 54 N.E. 3d at 1132 & n.3 (claim that foreclosure may be rendered invalid by mortgagee's failure to conduct pre-foreclosure face-to-face meeting survives summary judgment); Cook, 31 N.E. 3d at 1131 (mortgagor's claims to restore title and avoid eviction based on mortgagee's failure to comply with HUD regulations before foreclosing survive summary judgment).

## THE NOTICE DID NOT STRICTLY COMPLY WITH PARAGRAPH 22 AND PARAGRAPH 19 UNDER *THOMPSON* AND DECEPTIVELY FAILED TO INDICATE THAT THE DEFENDANT HAD UNTIL FIVE DAYS BEFORE A SALE DATE TO CURE

In view of the strict compliance requirement for all conditions precedent to foreclosure,

*Thompson* is clearly applicable to Rhode Island Law.  In *Thompson*, the First Circuit held:

The mortgage terms for which Massachusetts courts demand strict compliance include the provisions in paragraph 22 requiring and prescribing the pre-foreclosure default notice.

21

you can still avoid foreclosure by paying the total past-due amount before a foreclosure sale takes place"—could mislead the Thompsons into thinking that they could wait until a few days before the sale to tender the required payment.

Since Rhode Island law as established by case law in this District also imposes strict compliance, any analysis in *Thompson*, applies to Rhode Island mortgage cases.  Thus the Court's analysis of the interplay between paragraph 19 and paragraph 22 of the mortgage clearly apply to this case.  Paragraph 19 clearly states that a borrower has up to five days prior to the sale date to reinstate the mortgage loan, which had been accelerated by curing the arrearage.  In *Thompson*, the default letter had deceptively advised the mortgagee about the right to reinstate without providing the mortgagee the information that this right ended five days before the sale.

Here a similar notice, which omitted the paragraph 19 limitation was given to the Defendant:

Any payment to reinstate the mortgage after acceleration must therefore include an amount sufficient to cover such expenses and fees incurred. Payments received that are less than the amount sufficient to cover such expenses and fees incurred. Payments received that are less than the amount required to reinstate the Mortgage will be returned, and **will not stop any foreclosure proceedings** already begun on the Property.

In order to cure the default, payment for the total amount past due, plus any amount(s) becoming due in the interim, must be received on or before 06/17/2018, at the address listed on page four of this notice. Payment must be received by MoneyGram, bank check, money order or certified funds. Please be aware, after acceleration of the debt, there may be expenses and attorney's fees and costs incurred by us to enforce the terms of the Security instrument or mortgage agreement, in addition to the overdue amount of the mortgage account.
Failure to cure the default on or before the date specified in the notice may ersult in acceleration of the sums secured by the Security Instrument and sale of the Property. Upon acceleration, the total obligation will be immediately due and payable without further demand. In foreclosure proceedings, we are entitled to collect the total arrearage in addition to any expenses of foreclosure including but not limited to reasonable attorney's fees and costs. A customer has the right to reinstate the account after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense to acceleration and sale.


If the default is not cured on or before the date specified above, Ocwen Loan Servicing, LLC ("Ocwen"), at its option may require immediate payment in full of all sums secured by the

22

Security Instrument without further demand and may invoke the STATUTORY POWER OF SALE and any other remedies permitted under Applicable Law. Ocwen shall be entitled to collect all expenses incurred in pursuing the remedies provided under applicable law, including, but not limited to, reasonable attorney's fees and costs of title evidence. If Ocwen invokes the STATUTORY POWER OF SALE,  Ocwen shall mail a copy of a notice of sale to  the customer and to other persons in a manner prescribed by applicable law. . .If the mortgage account cannot be brought current, we should be contacted immediately do discuss possible alternatives to foreclosure.  We want to help remedy the delinquent status of this account and would like to discuss alternatives that might be available, While our primary objective is the collection of past due amounts on the account, we want to work to find the best available alternative to bring the account current. . . For any questions of concerns, we can be reached toll-free at 800.746.2936. We available Monday through Friday 8 am to 9pm and Saturday 8 am to 5 pm ET.
Daniel Robbins has been assigned as your relationship manager and will be your designated representative for resolution inquiries and submission of documents.

However this notice, despite offering the defendant the opportunity to reinstate after acceleration and providing a phone number to call to get the exact amount due to reinstate after acceleration, deceptively failed to tell the defendant that the right to reinstate would end five days before a sale.  *Thompson* made it clear that when interpreting strict compliance with contractual condition precedents to acceleration and sale, the Court did not require a showing of prejudice on the part of the mortgagee.  In *Thompson*, the First Circuit specifically held:

Paragraph 22 demands strict compliance, regardless of the existence, or not, of prejudice to a particular mortgagor

It was not necessary for the mortgagor in *Thompson* to demonstrate that he was  able to pay the arrearage, but only to allege that deception occurred in the default notice and that paragraph 22 was not strictly complied with by the mortgagee.

**THE NOTICE DID NOT STRICTLY COMPLY WITH THE MORTGAGE BY REQUIRING CERTIFIED FUNDS TO CURE**

*Thompson's* strict compliance obligation in a paragraph 22 notice, without the necessity of demonstrating prejudice likewise applies to all aspects of the default notice provided to the

23

defendant. The amount of the obligation must be the exact amount owed by the mortgagor, which is in default. There can be no other conditions which are imposed by the mortgagee and the acceleration amount must be accurate.  In this case none of these requirements were met.

The notice sent to the defendant required certified funds. However the only provision in the mortgage, which requires payment in certified funds is paragraph 1 which states:

However if any check or other instrument received  by Lender  as payment under this Note or this security instrument is returned to Lender unpaid, lender may require subsequent payments to due under the Noe and this Security Instrument be made in one or more of eh following forms, as selected by Lender: (a) cash; (b) money order: (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is  drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer

Defendant, as indicated in her affidavit,  never made a payment for which funds were returned. Thus there was no contractual basis for this demand for certified funds in the letter dated May 11, 2018. This additional term did not strictly comply with the terms of the mortgage and imposed an additional condition, not imposed by the language of the mortgage. *Thompson* holds that the Defendant does not have to demonstrate that she was prejudiced by this noncontractual condition imposed by Ocwen in its letter.  Thus this condition rendered the letter dated May 11, 2018 defective and as a result it could not be the basis for this foreclosure suit.

**THE NOTICE DID NOT STRICTLY COMPLY WITH THE MORTGAGE BY STATING AN INACCURATE AMOUNT OF THE ARREARAGE**

The letter also did not strictly comply with the terms of the mortgage since it did not state the exact amount of the arrearage. The Defendant has already demonstrated that the calculations under the mortgage and note were defective because the Mortgage Modification Agreement changed the amount of the obligations due under the mortgage, with the actual amount of the obligation being less due to the improper calculation of interest under the mortgage without

24

utilizing the lower interest rate of the modification.  The calculation by  Ocwen that  that the default consisted of $2,201,915,26, which included the inaccurate amount of fees of $6,086.49 and excess interest calculated by using the wrong formula plus the additional amounts which could be obtained by calling Ocwen at 800-746-2936 did not comply with *Martins*, *Dan Harry* or *Thompson*.  The addition of other charges for charges assessed after the date of the letter, under the terms of the mortgage could not be a component of the default letter. Such subsequent charges could not be added on to the original arrearage, since they were not specified with an actual amount and they were not subject to the thirty day right to cure and could not be the basis of an acceleration of the note. The notice stated that the mortgagor had to call  to obtain the exact amount due.  None of these requirements were included in the terms of the mortgage and as a result there was no strict compliance. Under *Thompson*, no prejudice needed to be demonstrated by mortgagor and thus the purported default notice was defective.

The letter's assertion that the Defendant owed $2,201,915.26 was also not accurate and as a result there was no strict compliance with the terms of the mortgage. Failure to provide an accurate default notice renders a Default Notice defective since the condition precedent to acceleration and sale, judicial or nonjudicial is an accurate stating of the amount in default. The Plaintiff's exhibit A demonstrated that the arrearage included multiple charges not permitted by the terms of the mortgage and included multiple inaccurate charges,   which were included in the purported default notice. This amount, claimed to be the arrearage,  included multiple unreasonable and unnecessary charges, which were charged by Ocwen to the mortgage loan account contrary to the terms of the mortgage.

25

Furthermore the Defendant has moved to strike the affidavit of Sony Prudent on the grounds that it does not comply with FRCP 56(c)(4) and the Federal Rules of Evidence Business Records exception. If the affidavit does not comply with Rule 56 or the hearsay rule there will be a genuine issue of a material fact which will preclude the Plaintiff from obtaining Summary Judgment. The recent decision of the First Circuit Court of Appeals in *US Bank National Association v. Jones*, 18-1719(May 30, 2019) references FRE 803(6) and records of prior mortgage services and  is the basis for Defendant's Motion to Strike the Affidavit of Sony Prudent, the purported affiant in the Summary Judgment motion in this case and is a basis for the Summary Judgement defense.  In *Jones*, the Court analyzed the hearsay rule and whether the testimony of a Caliber Loan Servicing employee and an exhibit referencing the status of the loan after two prior servicers was properly admitted under the hearsay rule business record's exception FRE 803(6).  The issue in *Jones* was whether there was a sufficient foundation under 803(6) for the current loan servicer employee to testify about the status of the mortgage loan account and how it was boarded into the electronic system of record of the current servicer.  In *Jones*, there was live testimony of a witness at a foreclosure trial. The Court set forth the criteria for the admission of records of another servicer.  The Court held:

[W]hether a third party's records . . . can be integrated into the records of the offering entity . . . for purposes of admission under the business records exception **is not an issue upon which this circuit has reached a uniform conclusion**" covering every instance. United States v. Savarese, 686 F.3d 1, 12 (1st Cir. 2012). **Rather, the admissibility of the evidence turns on the facts of each case.**

Thus, we have affirmed the admission of business records containing third-party entries without third-party testimony where the entries were **"intimately integrated**" into the business records, FTC v. Direct Marketing Concepts, Inc., 624 F.3d 1, 16 n.15 (1st Cir. 2010), or where the party that produced the business records "**relied on the [third-party] document and documents such as those[] in his business**," United States v. Doe, 960 F.2d 221, 223 (1st Cir.

26

1992) (internal quotation marks omitted). Conversely, in the absence of third-party evidence**, we have rejected the admission of business records containing or relying on the accuracy of third-party information integrated into the later record where, for example, the later business did not "use[] a procedure for verifying" such information, lacked a "self-interest in assuring the accuracy of the outside information,"** United States v. Vigneau, 187 F.3d 70, 77 & n.6 (1st Cir. 1999) (emphasis omitted), or sought admission of third-party statements made "by a stranger to it," Bradley, 891 F.3d at 35 (quoting Vigneau, 187 F.3d at 75 (alterations omitted)). The key question is whether the records in question are "reliable enough to be admissible." Direct Marketing Concepts, 624 F.3d at 16 n.15..

The Court reviewed the testimony of the trial witness and noted:

In answering that question, we are mindful that the "**reliability of business records is said variously to be supplied by systematic checking, by regularity and continuity which produce habits of precision, by actual experience of business in relying upon them, or by a duty to make an accurate record as part of a continuing job or occupation**." Fed. R. Evid. 803 advisory committee's note to 1972 proposed rules. The rule seeks "to capture these factors and to extend their impact" by applying them to a "regularly conducted activity." Id (emphasis added).

The District Court had received testimony from a loan servicer employee who had

testified that:

 **Caliber incorporated the previous servicer's records into its own database and "plac[ed] its own financial interest at stake by relying on those records," and that "Caliber's acquisition department took steps to review the previous servicer's records in a way that assured itself of the accuracy of the records**." 330 F. Supp. 3d 530, 543 (D. Me. 2018); see Trial Tr. 28:3-6, 60:17-19.

(emphasis added)

The Court also noted that the mortgagor did not dispute the transaction history by claiming

overbilling or unrecorded payments not contested the findings of the District Court that there

were no discrepancies.

 In view of *Jones*, the affidavit of Sony Prudent is defective because it does not verify

anything about the boarding or the verification of the records of Homeward Residential

(formerly American Home Mortgage Servicing, Inc. incorporated in Delaware on September 6,

27

2007 as indicated in its filing with the Rhode Island Secretary of State on December 18, 2007, attached to this memorandum).  This corporation was not the original American Home Mortgage Servicing, Inc. which was the servicer from origination of the mortgage loan and which filed a Chapter  11 Bankruptcy Petition on August 6, 20007 in case number 07-11050 in the United States Bankruptcy Court for the District of Delaware as indicated by the attached Exhibit to this memorandum.   Thus this mortgage loan has been serviced by four entities:

(1) The first American Home Mortgage Servicing, Inc. until its bankruptcy on August 6, 2007.

(2) The second American Home Mortgage Servicing, Inc. from its creation on September 6, 2007 until its name change of Homeward Residential,  Inc. on May 31, 2012 as reflected in the attached record of the Rhode Island secretary of state.

(3)     Ocwen Loan Servicing, LLC from February 4, 2013 to June 1, 2019.

(4) PHH Mortgage Services from June 1, 2019.

One issue for the Court's consideration of this issue is that Ocwen's records have been admitted by it to be inherently inaccurate in filings with the State of Rhode Island and the State of New York.  See attached Consent Orders filed with the State of New York and Rhode Island. In these filings Ocwen made certain concessions and admissions. In its December 15, 2012 Consent Order in New York, Ocwen admitted:

WHEREAS, the examination also preliminarily identified instances that the Department believes indicate non-compliance with the Agreement by Ocwen, including, in some instances: (1) failing to provide certain bonowers direct contact information for their designated loss mitigation staff or a single point of contact ("SPOC"); (2) pursuing foreclosure actions against certain bonowers

who are seeking a loan modification (refered to in the Agreement as "dual tracking"); (3) failing to conduct an independent review of certain loan modification denials; (4) **failing to demonstrate its adoption of policies and procedures to effectively track sanctioned third-party vendors, including local foreclosure counsel; (5) failing to demonstrate its implementation of policies and procedures to verify borrower information on newly boarded accounts to accurately reflect the status and current balance of the borrower's account;**
(Emphasis added)

In its December  19, 2014 Consent Order in New York,  Ocwen admitted:

17. Ocwen's core servicing functions rely on its inadequate systems. Specifically, Ocwen uses comment codes entered either manually or automatically to service its portfolio; each code initiates a process, such as sending a delinquency letter to a borrower, or referring a loan to foreclosure counsel. With Ocwen's rapid growth and acquisitions of other servicers, the number of Ocwen's comment codes has ballooned to more than 8,400 such codes. Often, **due to insufficient integration following acquisitions of other servicers, there are duplicate codes that perform the same function.** The result is an unnecessarily complex system of comment codes, including, for example, 50 different codes for the single function of assigning a struggling borrower a designated customer care representative.

18. Despite these issues, Ocwen continues to rely on those systems to service its portfolio of distressed loans. Ocwen's reliance on technology has led it to employ fewer trained personnel than its competitors. For example, Ocwen's Chief Financial Officer recently acknowledged, in reference to its offshore customer care personnel, that Ocwen is simply "training people to read the scripts and the dialogue engines with feeling." Ocwen's policy is to require customer support staff to follow the scripts closely, and Ocwen penalizes and has terminated customer support staff who fail to follow the scripts that appear on their computer screens. In some cases, this policy has frustrated struggling borrowers who have complex issues that exceed the bounds of a script and have issues speaking with representatives at Ocwen capable of addressing their concerns. Moreover, Ocwen's customer care representatives in many cases provide conflicting responses to a borrower's question. Representatives have also failed in many cases to record in Ocwen's servicing system the nature of the concerns that a borrower has expressed, leading to inaccurate records of the issues raised by the borrower.

19. Ocwen's inadequate infrastructure and ineffective personnel have resulted in Ocwen's failure to fulfill its legal obligations. Prior to the Department's and the Compliance Monitor's review, Ocwen did not take adequate steps to implement reforms that it was legally obligated to implement pursuant to the 2011 Agreement.

On September 28, 2017, Ocwen and its predecessor Homeward Residential

entered into a Consent Order with the State of Rhode Island Department of Business Regulation, in which it agreed to eliminate its defective electronic system of record, called RealServicing. This was part of a nationwide settlement with Ocwen and its affiliates.  These regulatory actions and concessions and admissions by Ocwen indicate the unreliability of its electronic system of record and its failure to verify status of loans boarded on its system after servicing transfer.

        This mortgage is not a simple interest mortgage. Rather it is a negative amortization adjustable rate mortgage.  There are three purported affidavits submitted in this case. They are the affidavit in support of the original complaint, the affidavit in support of the amended complaint and the affidavit in support of the motion for summary judgment.  The first two affidavits were the affidavits which were the subject of the Defendant's discovery requests.  The summary judgment affidavit was executed by another Ocwen "employee", Sony Prudent who did not comply with the provisions of  FRE 803(6) and *Jones*. This  purported affidavit states:

I, Sony Prudent, hereby declare and state as follows:

1. I am a Senior Loan Analyst for Ocwen Financial Corporation, whose indirect subsidiary is Ocwen Loan Servicing, LLC ("Ocwen"), and I am authorized to/make this affidavit on behalf of Ocwen. Ocwen is the loan servicer for the subject mortgage loan on behalf of Plaintiff, Citibank, N.A., as Trustee for American Home Mortgage Assets Trust 2006-3, Mortgage Backed Pass-Through Certificates Series 2006-3 ("Citibank,as Trustee").

I am over the age of 18 and competent to testify as to the matters contained in this affidavit. I have access to the business records of Ocwen, including the business records for and relating to the loan at issue in this litigation. I make this affidavit based upon my review of those records relating to the loan and from my own personal knowledge of how they are kept and maintained. The loan records are maintained by Ocwen in the course of its regularly conducted business activities and are made at or near the time *of* the event, by or from information transmitted by a person with knowledge. It is the regular practice to keep such records in the ordinary course of a regularly conducted business activity. Ocwen's records that relate to the loan that I reviewed and relied upon for the statements made in this Affidavit include images of the note, Ocwen's electronic servicing system and images of correspondence.

30

3. I have reviewed Ocwen's records with respect to mortgage loan number ending 2929 for the borrower and Defendant, Katherine L. Caito (the "Borrower").

9. Borrower failed to cure her default by June 17, 2018, as was required in the Notice of Default to avoid acceleration and sale. Borrower has not reinstated the Mortgage following her receipt of the Notice of Default. Following the Borrower's failure to cure her default, judicial foreclosure proceedings were then commenced to proceed to a foreclosure auction of the Property.

10. According to Ocwen's records, as of May 14,2019, approximately $4,622,474.40 is due and owing in principal, $1,350,190.85 is due and owing in interest, and $210,438.82 is due and owing in escrow payments on the Borrower's mortgage loan.

11. Since Borrower's default on the Mortgage in May 2012, additional costs, fees and expenses have been incurred on Borrower's mortgage loan and applied to. the unpaid balance. Attached hereto as *Exhibit A* is a true and accurate copy of the Payment Reconciliation History on the Mortgage, itemizing all costs, fees and expenses applied to the account. All costs, fees, and expenses are necessary and proper and were incurred in compliance with the terms of the Note and Mortgage.

This affidavit  does not meet the criteria of *Jones* or FRE 803(6). Thus the discovery

regarding the amount of the default and the amount which could be accelerated needs to be

conducted. The First Circuit indicated in *Jones* that the following was necessary to allow

business records into evidence which incorporated another company's records:

"reliability of business records is said variously to be supplied by systematic checking, by regularity and continuity which produce habits of precision, by actual experience of business in relying upon them, or by a duty to make an accurate record as part of a continuing job or occupation

No such language was contained in the Sony Prudent affidavit. No reference was made to

the prior servicers' records. No language indicated that Ocwen integrated these records into its

own business records after verification of the reliability of the prior servicers' records as to the

status of the loan when it was service transferred first to American Home Mortgage Servicing,

31

Inc. 2( Homeward Residential) and then to Ocwen. In fact neither the word reliable nor integrate

appears in the  affidavit for Summary Judgment. Nor is there any reference to the prior servicers.

Ocwen simply cannot establish what the status of the mortgage loan account was when the loan

was service transferred on February 4, 2013. Its supposed payment reconciliation attached to the

Summary Judgment has no reference to the prior history of the loan, which was a negative

amortization, adjustable rate mortgage. Plaintiff has not presented reliable non-hearsay discovery

regarding the status of the mortgage loan when the original AHMSI filed bankruptcy, when

Homeward Residential (AHMSI2) commenced servcing and when the loan was transferred to

Ocwen. Plaintiff's affiant did not vouch for the reliability of these records nor did it comply with

the requirements of FRC 803(6) as set forth in *Jones*. This affidavit did not identify the records

which the affiant reviewed and did not provide anything other than  a regurgitation of the hearsay

business exception statute. There is no evidence  as to whether of the manner in which the

witness verfied the prior servicer's records.

Ocwen  has admitted in three Consent Orders in New York and one in Rhode Island, that

its electronic system of record is not accurate. These Consent Orders cast doubt on Ocwen's

record keeping and raise issues with the amount of the purported arrearage and the alleged

balance. This is a negative amortization mortgage, whose original servicer was American Home

Mortgage, then after that entity's bankruptcy was service transferred to American Home

Mortgage Servicing, Inc. ("Homeward Residential") and then to Ocwen (now to PHH Mortgage

Services). Since the records were not  verified, then the affidavit is not compliant with the

hearsay rule and cannot support the  accuracy of the default letter and the amount accelerated.

The Federal Rules of Evidence require certain proof of the records of other business entities, and

32

proof of Ocwen's, Homeward Residential's and American Home Mortgages' records under FRE 901, 902 and the business records exception of the hearsay rule.

As indicated by the Defendant's affidavit, this amount, claimed to be the arrearage, included the following improper charges which rendered the default notice inaccurate. All the charges for foreclosure and foreclosure related charges were not accurate charges contained within the $6086.49 fees and expenses of the May 11, 2018 letter.  These charges which resulted in the $6086.49 being inaccurate were the following:

| | | |
|---|---|---|
| 11-14-16 | FC thru Judgment | $556.25 |
| 4-1-16 | Selling Office/Sheriff Cancel fee | $425.00 |
| 3-8-16 | Sale Publication | $1203.76 |
| 2-22-16 | Selling Officer/Sheriff Cancel Fee | $425.00 |
| 2-1-16 | FC Thru complaint | $125.00 |
| 2-1-16 | Selling Officer/Sheriff Cancel Fee | $425.00 |
| 2-1-16 | Sale Publication | $714.88 |
| 7-23-13 | FC thru Title search | $520.00 |

These total fees totaled $4394.90.  The Defendant's affidavit indicates that she never received a default letter pursuant to the terms of the mortgage which would have allowed any exercise of the statutory power of sale. Thus all the foreclosure related charges were not accurate and should not have been included in the purported default notice. The 2015 Default letter which led to the 2016 foreclosure attempt, was delivered into the US mail 29 days before the cure date. This rendered the letter defective. Thus all fees charged in 2016 for foreclosure or advertising should

have been removed from the mortgage loan account and thus the 2018 letter was defective for including fees from that and other foreclosures.

In addition, in 2015 and 2016, the law firm of Korde & Associates, P.C. was not licensed to practice law in Rhode Island as indicated by the affidavit of Kerri Hall referencing the records of the Rhode Island Supreme Court. Thus Defendants contend that there is a genuine dispute of fact as to the assertion that the Plaintiff sent any notice of acceleration through Korde & Associates, P.C.  This law firm was not registered to practice law in the State of Rhode Island until March 16, 2017. This was confirmed by an email, dated July 23, 2018 from Thomas M. Bergeron, Esq., the Acting Administrative Assistant to the Chief Justice of The Rhode Island Supreme Court. A copy of this email is attached to the Affidavit of Christina Mercurio. The assertion that this firm represented the Plaintiff is not true since it was not authorized to practice law in Rhode Island until March 16, 2017.  There is no affidavit indicating that Korde & Associates, P.C. was an agent of the Plaintiff or the loan servicer at any time before March 16, 2017 or at the time of the alleged default notice or commencement of the exercise of the statutory power of sale. Article II of the Rules of the Rhode Island Supreme Court entitled Admissions of Attorneys and Others To Practice Law is attached to the Memorandum of Law, which states in Rule 10:

(a)Attorneys at law admitted to practice before this Court may engage in the practice of law in the form of professional service corporations as provided by the Professional Service Corporation Law G.L. 1956  7-5.1-1 to to 7-5.1-2.
(c)  A limited liability entity may not engage in the practice of law unless and until it applies to and receives from this Court a license to operate as a limited liability entity and only so long as such license remains in good standing.
This Rule also states:

(d) Within thirty (30) days after filing its limited liability entity charter with the Secretary of State, each limited liability entity formed to engage in the practice of law shall file with the Clerk

of the Supreme Court a copy of its limited liability entity charter together with an application for license on a form to be prescribed by the Clerk setting forth: (1) The name and address of the limited liability entity; (2) The names and addresses of all shareholders, directors and officers, if the applicant is a professional service corporation; partners if the applicant is a registered limited liability partnership; and managers and members if the applicant is a limited liability company, each of whom must be an attorney authorized to practice law; and the state or jurisdictions where each is licensed to practice law; (3) A representation that at the time of filing, each attorney in the organization is in good standing in this state or, if licensed to practice elsewhere, in every state or jurisdiction in which he or she is licensed; (4) The names and address of all of its attorneys who will practice law in Rhode Island. (5) The name and address of the insurance company writing the insurance required by G.L. 1956 § 7-5.1-8 or § 7-12-58, or 7-16-3.3 and shall attach to the application a copy of the certificate furnished by the insurance company to the limited liability entity; (6) Such other information as the court may from time to time prescribe. The license application shall be submitted electronically through the electronic filing system of the Clerk's Office, when such systems are available. The application shall be submitted by an attorney who is licensed and in good standing to practice law in this state. The Clerk is authorized to waive the electronic filing requirement in a given year if filing electronically will cause undue hardship. The license application shall be submitted with a two hundred dollar ($200.00) application fee. Applications filed after thirty (30) days from the filing of the limited liability entity charter with the Secretary of State, shall be subject to an additional one hundred and twenty five dollar ($125.00) late fee. The Clerk shall review the copy of the limited liability entity charter and the application for license to determine if all requirements of law and these rules have been complied with and notify the court of his or her findings. The court may then order the issuance of a license to practice to the limited liability entity or may refer the application for further consideration to such committee as it may appoint or designate.

There is a good faith dispute of the assertion that Korde & Associates, P.C. was the agent of Plaintiff or the loan servicer. There is also no assertion that Shana Costa, whose initials appear on the purported Notice of Default had been hired to represent the Plaintiff on October 30, 2015.There is also a dispute as to whether an acceleration notice or Notice of Sale could be sent by any entity due to the fact that the Defendant was never mailed a default notice pursuant to the terms of the mortgage.   Korde & Associates, P.C. could not take any action on behalf of the Plaintiff, because it would be violating the provisions of R.I.G.L. 11-27-1 et seq., which prohibits the unauthorized practice of law. More importantly there is no evidence presented that Korde & Associates, P.C. or Shana Costa, whose name appears on the purported default notice

35

was the agent for the purported mortgagee. Without such proof of agency, the acceleration letter and Notice of Sale were void due to the defective default notice could not have been demonstrated as being sent by an agent for the Plaintiff.

**OTHER FEES WERE IMPROPERLY CHARGED**

As indicated by the Defendant's affidavit, at no time was a sheriff ever hired to sell her home. Nor at any time was there a Selling Officer or any other official hired to sell her home. At no time was a judicial foreclosure commenced in 2013-2016, which could result in a Judgment being entered. Despite this fact, the  purported default letter included three fees for service of process, specifically the following:

| | | |
|---|---|---|
| 5-8-15 | Service of process | $22.10 |
| 2-7-18 | Service of Process | $10.84 |
| 2-22-16 | Service of Process | $56.54 |

The purported default letter also included a fee for additional hour court appearance of $50.00 on 2-22-16.There was no Court appearance  for an attorney to be paid an extra hourly fee on February 22, 2016 and where there was never any servicer of process on the Defendant as indicated by her affidavit, which also stated that she  was never served process by Ocwen or any other entity.

The purported default letter included three skip trace fees, specifically the following:

| | | |
|---|---|---|
| 5-8-18 | Skip Trace fee | $5.46 |
| 2-22-16 | Skip Trace fee | $5.30 |
| 7-23-13 | Skip Trace fee | $5.30 |

36

Such fees are incurred to determine the address of the borrower. However as indicated by her affidavit, the Defendant had always lived at her home at 16 Yosesmite Valley Road, Westerly, RI, 02891 and there was no reason to search for her address, as Ocwen knew that she was living in the house.

.       The total fees of $6086.49 also included property inspection fees for the period from April, 2013 to May 2018 in the amount of $458.74 for 37 separate charges. At all times Ocwen was aware that the Defendant was living in the property and that she had an attorney, throughout this entire time.  She paid the taxes for the property from 2016 through 2018.       Ocwen knew that the property was not abandoned and that there was regular contact with the Defendant or her attorney.  She also indicated that at no time did any person come into her home to inspect the condition of the house. Ocwen's compute system automatically orders property inspection fees when a loan is in arrears.   As a result of improper charges referenced herein,  the purported default notice contains inaccurate charges included in the $6086.49 charges for fees and expenses.


       The Title search fee of $282.00 was not a reasonable fee for a non-attorney. This fee was included in the purported Exhibit A and the amount claimed in default.  Defendant will provide an affidavit tomorrow which indicates that the normal procedure for attorneys in Rhode Island is to obtain a title examiner from the title company  who lives near the City or Town Hall in which the search will be conducted. The attorney's affidavit will also demonstrate that a customary and reasonable fee for a title search such as the Defendant's property would be no more than $150.00

and less if an online search was conducted in the Town of Westerly's website. Thus there is a genuine dispute as to the accuracy of the default letter in regard to this charge.

The property inspection fees are designed for the purpose of determining whether the property was vacant and to preserve and maintain the property. Paragraph 7 provides that Lender or its agent may make reasonable entries upon and inspections of the property. The burden of proof of the reasonableness of all these multiple property inspections on a monthly basis lies with the Plaintiff, who has not addressed these issues other than to suggest that there were charges to the mortgage loan account without any evidence of reasonableness or actual payment and the value of the services provided.

The Plaintiff has also not demonstrated that any of these fees were paid to the vendors who purportedly provided the services.  The burden of proof to the plaintiff is to demonstrate that all the fees which were charged were actually paid.  The affidavit does not state this in any manner. It only references an Exhibit
A, with no invoices attached.  The burden of proof is on the Plaintiff to prove that these charges were reasonable and necessary and actually paid.

Since the amount of the alleged arrearage was not accurate, the transmittal of an inaccurate amount to cure did not strictly comply with the terms of the mortgage. The mortgage clearly states that the mortgagee must be provided the amount of the default.        Ocwen deceptively provided the wrong amount of the default for the reasons alleged in this memorandum. Since this default amount included charges not permitted by the terms of the mortgage, it was inaccurate.   The failure to provide an accurate default amount resulted in this letter not strictly complying with the terms of the mortgage and as a result the Defendants did not

strictly comply with the terms of the mortgage and a  condition precedent to acceleration and sale and filing this action was not met. *Thompson* held that there was no need to demonstrate prejudice regarding this issue and as a result, this letter was insufficient to trigger the right to exercise the statutory power of sale.

      *Thompson* clearly applies to Rhode Island mortgages as it looked at strict compliance and determined that strict compliance applies to all aspects of the paragraph 22 letter. When read in conjunction with *Martins* and *Dan Harry*, *Thompson* mandates that this notice includes:

a.      the amount of the default

b.      the exact date, at least thirty days from the date the letter is deposited in the mail that this exact arrearage must be cured to avoid acceleration and sale

c.      The right to be advised of the right to reinstate after acceleration

d.      The right to bring a court action to assert the nonexistence of a default and any other defenses to acceleration and sale.

Due to the language of the letter from Ocwen which added additional terms, then there was no strict compliance with the terms of the mortgage.

      Under paragraph 19, once the default letter mentions options to avoid foreclosure and any payment of the arrearage, it must under paragraph 22 advise   the mortgagor that reinstatement can only occur by paying the exact arrearage amount stated in the letter no later than five days before the sale. Failure to so provide this information constitutes deceptive language, not permitted by paragraph 22 of the mortgage. In this case,  Ocwen included language prohibited by *Thompson*, which told the defendant how to obtain the actual amount of the arrearage and how to

39

make this reinstatement payment, albeit by certified funds, not allowed by the terms of the

mortgage. The First Circuit in *Thompson* held:

> Omitting the qualification (that the payment must be tendered at least five days before the foreclosure date) in our view rendered the notice potentially deceptive.

The holding in *Thompson* applies to any mortgage contract which requires strict

compliance, not just Massachusetts mortgages.  In Massachusetts such strict compliance was

recognized in the mortgage context by the Massachusetts Supreme Judicial Court in *Pinti v.*

*Emigrant Mortg. Co.*, 33 N.E.2d 1212 (Mass. 2015).  In this jurisdiction strict compliance with

the terms of the mortgage was recognized in *Martins*, citing pre-existing and established Rhode

Island contract and property law.        Thus failure to comply  strictly with paragraph 22 renders

this foreclosure action subject to dismissal for failure to comply with a condition precedent.

*Thompson* makes it clear that the defendant does not have to demonstrate prejudice that he was

precluded from paying off the loan by the incorrect amount stated in the default letter. Rather

under *Martins, Dan Harry* and *Thompson*, once there is non-compliance with the terms of the

mortgage in the purported default letter, such letter could not be the basis to foreclose judicially

or exercise the statutory power of sale.  *Thompson* made it clear that mortgage provisions such as

paragraph 22 required strict compliance. Thus prejudice need not be demonstrated by the

Defendant, who was not required to allege that she could have cured the default had the amount

stated been accurate or that any other terms of the purported default letter did not strictly comply

with the terms of the mortgage. The First Circuit's holding went well beyond the 5 day before

the sale limitation for reinstatement. It unequivocally indicated that strict compliance would not

40

require a showing that the mortgagor was prejudiced by the defective notice and as a result, this case clearly impacts all Rhode Island mortgage cases.

Also, Judge Burroughs of the United States District Court for the District of Massachusetts ruled that the failure to strictly comply with paragraph 22 rendered the foreclosure sale void. *Paiva v. Bank of N.Y. Mellon*, 2015 U.S. Dist. LEXIS 105370 (D. Mass. Aug. 11, 2015). In the *Paiva* case, the court agreed with the borrower's contention that the mortgage servicer's "notice of default did not satisfy the requirements of paragraph 22 of the mortgage, not because any of the required substance was missing from the notice, but because the notice should have come from [Bank of New York Mellon] as the lender, rather than from Countrywide as the servicer of the loan." *Id*. at *5-6. Relying on the *Pinti* decision, the court held that the mortgagee failed to strictly comply with the mortgage and declared the foreclosure sale void. *Id*. at *8. See also *United States Bank Nat'l Ass'n v. Rotondi*, 2015 Mass. App. Div. LEXIS 56 at *5-6 (Mass.App. Div. 2015) (declaring foreclosure sale void due to "no compliance with the notice provisions of paragraph 22" because servicing agent sent notice of default before purported mortgagee held an interest in the mortgage). In this case, no reference was made at all in the purported letter dated May 11, 2018, to the actual owner of the mortgage loan.

The analysis of *Paiva* was followed by  the recent case of *Saade v Wilmington Trust National Association*, No. 18-cv-11534 D. Mass., February 28, 2019, in which the Court stated:

> The court agrees with the Paiva decision only to the extent that the servicer sending the Notice of Default sends it on behalf of the prior lender or fails to identify the lender at the time of the Notice. But here, the Notice of Default was sent on behalf of the identified current lender. Mot. for Prelim. Inj. [#45-1], at 4 ("[T]his firm has been retained by Fay Servicing,

LLC as servicer for Wilmington Trust, National Association, not in its individual capacity, but solely as trustee for MFRA Trust 2014-2 (the `Mortgagee') . . . ."].[3] Saade has not provided, and this court has not found, further authority for the notion that strict compliance with Paragraph 22 precludes the lender from acting through its agents, such as the servicer or a law firm, where the lender is explicitly identified.

*Thompson* makes it clear that strict compliance must be followed in all respects. The mortgage requires that the Lender, or its assigns be the entity which declares the default, even if that is done by a servicer on behalf of an identified lender/mortgagee. The Supreme Court had previously mandated that a notice had to be sent by an attorney on behalf of the owner of the property. In the case of *De Luca v. Cinima*, 72 R.I. 346, (R.I., 1947), an alleged notice to quit was not valid. In order to be valid the notice to quit must be from the landlord and the signing should be in some form clearly indicating that the notice originated with the landlord.

The cases of *Leite* v. *Croveiro,* 36 R.I. 62, 89 A. 20, (R.I., 1913)  support this position.   In the *Leite* case the court, at page 64, stated:

While the statute does not prescribe any particular form of notice nor direct the particular manner in which such notice shall be served it does contain the explicit statement that the notice must be from the landlord. In the case at bar the notice itself does not contain anything showing it emanated from the landlord, who is the only person, under the statute, qualified to give an effective notice. It is simply a notice from an attorney without the employment of any words indicating that he is acting for or in behalf of the landlord. In the absence of any statement to that effect in the notice itself, the court cannot assume that the attorney in affixing his own signature thereto was acting for the plaintiffs. Nor can the plaintiffs be permitted to supply the omission by oral testimony."

The Rhode Island Supreme Court in *Tate v. Reynold,* 622 A. 2d 449 (R.I., 1993) reviewed compliance with a Rhode Island statute, which required a notice to quit to be provided by an attorney acting on behalf of the party providing the Notice to Quit:

On appeal defendant asserts that the February 1985 notice to quit was facially defective because it did not indicate that an agent was acting on behalf of the landlord. The statute governing notices to quit, G.L. 1956 (1984 Reenactment) § 34-18-4, has been construed in two cases that support defendant's position. The defendant cites *DeLuca v. Cinima,* 72 R.I. 346, 51

A.2d 369 (1947), and *Leite v. Croveiro,* 36 R.I. 62, 89 A. 20 (1913), in its argument. In *Leite* the court noted that the statute contained "the explicit statement that the notice must be from the landlord." 36 R.I. at 64, 89 A. at 20. The *DeLuca* court emphasized that when a notice to quit comes from a source other than the landlord, the important factor is whether the statute has been complied with and not whether the tenant has been misled by the notice given. 72 R.I. at 350, 51 A.2d at 370-71. Therefore, we agree with defendant and hold that the trial justice erred in concluding that the February 1985 notice to quit was valid. The second notice to quit contained the landlord's name. Thus it complied with the provisions of § 34-18-4 because it clearly indicated that it emanated from the landlord. *See id.*

### THE PLAINTIFF DID NOT ACCELERATE THE NOTE

There is no genuine dispute of material fact that the Plaintiff did not mail the Defendant an acceleration notice pursuant to the terms of the mortgage, prior to filing this complaint. However the Plaintiff admits that no such acceleration has occurred and demands that the Court order the mortgage accelerated. However an acceleration letter  is an essential component to commencing a Judicial Foreclosure or to exercise the statutory power of sale as defined and detailed in the mortgage contract and the promissory note. This is mentioned in paragraph 22 of the mortgage, which is the precondition to acceleration and sale:

Acceleration; Remedies. **Lender shall give notice to Borrower prior to acceleration** following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The     notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice **may result in acceleration of the sums secured by this Security Instrument and sale of the Property**. The notice shall further inform     Borrower of the right to reinstate after acceleration and the right to bring an action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option **may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the STATUTORY POWER OF SALE** and any other remedies permitted by Applicable Law.  Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the STATUTORY POWER OF SALE, Lender shall mail a copy of a notice of sale to Borrower as provided in Section 15.  Lender shall publish the notice of sale, and the Property shall be sold in the manner prescribed by Applicable Law. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

In addition, the mortgage contract allows the mortgagor to reinstate after acceleration in order to avoid the statutory power of sale. Paragraph 19 is entitled **Borrower's Right to Reinstate After Acceleration** and states:

If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument . . . Upon reinstatement by Borrower this security instrument and obligation secured hereby shall remain fully effective as if no acceleration had occurred.

It is undisputed that Plaintiff has never received an acceleration notice as required by the terms of her mortgage. The provisions in paragraph 22 of the mortgage were a condition precedent to the exercise of the power of sale of the mortgage.  There was no compliance with the terms of the mortgage to exercise the statutory power of sale as indicated above.  No acceleration was declared and as a result the statutory power of sale could not be exercised due to the failure of Defendants to accelerate the mortgage loan by an acceleration letter.

The Defendant never received such a notice, which Plaintiff admits.  It asks the Court to accelerate the loan, which had to be done prior to filing this action, not to ask the Court to accelerate. In any case, the loan cannot be accelerated due to the fact that the Defendant did not receive a valid default letter.

## CONCLUSION

*Thompson* made it clear that notices prior to foreclosure must be accurate and will be strictly construed as contractual condition precedents to the exercise of the statutory power of sale and to judicial foreclosures. There are genuine issues of material fact which  preclude Summary Judgment for the Plaintiff. For the reasons stated in this memorandum, the Plaintiff's

Motion for Summary Judgment should be denied and the complaint dismissed for failure to meet

a condition precedent of the mortgage.

July 15, 2019

KATHERINE CAITO
By her Attorney

/s/ John B. Ennis
JOHN B. ENNIS, ESQ. #2135
1200 Reservoir Avenue
Cranston, Rhode Island 02920
(401) 943-9230
jbelaw75@gmail.com

CERTIFICATION OF SERVICE

I hereby certify that I emailed a copy of this Memorandum of Law  to Samuel Bodurtha and Ethan Teiger on May 15, 2019.


/s/ John B. Ennis, Esq.