STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
DEPARTMENT OF BUSINESS REGULATION
1511 PONTIAC AVENUE, BLDG 68/69
CRANSTON, RI 02920

IN THE MATTER OF:                                    :
                                                     :
OCWEN LOAN SERVICING, LLC                            :        DBR NO.  17BK001
OCWEN MORTGAGE SERVICING, INC.                       :
HOMEWARD RESIDENTIAL, INC.                           :
OCWEN BUSINESS SOLUTIONS, INC.                       :
OCWEN FINANCIAL SOLUTIONS PRIVATE LIMITED            :
                                                     :

## CONSENT ORDER

It is hereby agreed by and between the Rhode Island Department of Business Regulation and

the above-captioned Respondent Parties as follows:

## I.    AUTHORITY OF THE RHODE ISLAND DEPARTMENT OF BUSINESS REGULATION

1.  The Rhode Island Department of Business Regulation ("Department") has jurisdiction over

    this matter pursuant to R.I. Gen. Laws §§ 19-14-1 *et seq*., 19-14.1-1 *et seq*., and 19-14.11-1 *et

    seq*.

2.  Effective July 1, 2015, "[n]o person shall engage within this state in the business

    of...[s]ervicing a loan, directly or indirectly, as a third-party loan servicer...without first

    obtaining a license or registration from the [Department] director or the director's designee."

    R.I. Gen. Laws § 19-14-2(a)(8).

3.  R.I. Gen. Laws § 19-14-7 authorizes the Department to investigate applicants and gives the

    Department discretion to approve or deny applications including on the basis of whether the

    "financial responsibility, experience, character, and general fitness of the applicant"

1

demonstrate that "the business will be operated honestly, fairly, and efficiently within the purposes of [Title 19]."

4. Pursuant to R.I. Gen. Laws § 19-14-23, the Department is authorized to investigate the loans and business and examine the books, accounts, papers, records, and files of licensed lenders transacting business in Rhode Island, to determine compliance with the provisions of Rhode Island law, and any rule, or regulation issued thereunder, and with any law, rule, or regulation applicable to the conduct of the licensed business.

5. R.I. Gen. Laws § 19-14-23(e) and (f), respectively, authorize the Department to issue a cease and desist order against financial services businesses operating without requisite licensure under Chapter 19-14 and to assess an administrative penalty against any person so ordered in an amount of up to $1,000 per violation.

## II.   RESPONDENT PARTIES

6. The Respondent Parties (also collectively referred to herein as "Respondents" or "Ocwen"), Ocwen Loan Servicing, LLC; Ocwen Mortgage Servicing, Inc.; Homeward Residential, Inc; Ocwen Business Solutions, Inc.; and Ocwen Financial Solutions Private Limited and/or their corporate parents are wholly-owned subsidiaries of Ocwen Financial Corporation ("OFC"), a Florida corporation with headquarters in West Palm Beach, Florida.

7. Respondent Ocwen Loan Servicing, LLC (NMLS ID # 1852) (hereinafter "OLS") is a Delaware limited liability corporation that was, at all relevant times herein, a wholly-owned subsidiary of Respondent Ocwen Mortgage Servicing, Inc. (NMLS #1089752) (hereinafter "OMS"), a U.S. Virgin Islands corporation with headquarters in St. Croix, US Virgin Islands.

2

8.  Respondent OLS is (a) the holder of a Rhode Island Lender License and a Rhode Island Debt Collector Registration and (b) an applicant for a Rhode Island Third Party Loan Servicer License (01/21/2016 Date of Application).

9.  Respondent OMS is (a) the holder of a Rhode Island Debt Collector Registration and (b) an applicant for a Rhode Island Third Party Loan Servicer License (01/08/2016 Date of Application).

10. Respondent Homeward Residential, Inc. (NMLS #3984) (hereinafter "HRI") is a Delaware corporation wholly owned by of Homeward Residential Holdings, Inc. (hereinafter "HRS").

11. Respondent HRI is (a) the holder of a Rhode Island Lender License and (b) an applicant for a Rhode Island Third Party Loan Servicer License (01/06/2016 Date of Application).

12. Respondent Ocwen Business Solutions, Inc., (NMLS #1283393) (hereinafter "OBS") is a Philippines corporation owned 99.99% by Ocwen Netherland, B.V. ("ON") in turn owned by Ocwen Luxembourg II S.a.r.l.

13. Respondent OBS is (a) an applicant for a Rhode Island Third Party Loan Servicer License (05/12/2016 Date of Application), and (b) an applicant for a Rhode Island Debt Collector Registration.

14. Respondent Ocwen Financial Solutions Private Limited (NMLS #15877) (hereinafter "OFSP") is an Indian corporation owned by Ocwen Asia Holdings Ltd I ("OAH") a Mauritius corporation in turn owned by Ocwen Luxembourg II S.a.r.l.

15. Respondent OFSP is (a) the holder of a Rhode Island Debt Collector Registration and (b) an applicant for both (i) a Rhode Island Lender License (8/23/16 Date of Application) and (ii) a Rhode Island Third Party Loan Servicer License (03/17/2016 Date of Application).

3

16. The pending Rhode Island Third Party Loan Servicer License Applications submitted by the Respondent Parties on the Dates of Application listed above (hereinafter referred to collectively herein as the "Third Party Servicer Applications") were denied pursuant to the Emergency Order issued by the Department as described in Paragraph 21 below.

### III.   FACTS AND TRAVEL

### A.   MULTI-STATE MORTGAGE COMMITTEE BACKGROUND

17. The compliance terms set forth in Exhibit A hereto entitled "Global Minimum Settlement Terms" are based on terms negotiated by the Multi-State Mortgage Committee ("MMC"), a representative body of state mortgage regulators appointed by the Conference of State Banking Supervisors ("CSBS") and the American Association of Residential Mortgage Regulators ("AARMR") to represent the examination interests of the combined states under the Nationwide Cooperative Protocol and Agreement for Mortgage Supervision, to which Rhode Island is a member.[1]

18. By way of a brief history and travel of this matter under the direction of the MMC, certain "Examining States" conducted a Multi-State Examination of Ocwen covering the period of January 1, 2013 to February 28, 2015 in order to determine Ocwen's compliance with applicable federal and state laws and regulations, financial condition, and control and supervision of the licensed mortgage servicing operations.

19. The Examining States alleged several violations of state and federal law, including, but not limited to: consumer escrow accounts that were unaudited and characterized by inaccurate, confusing and/or misleading escrow statements routinely sent to consumers, including

---

[1] Pursuant to R.I. Gen. Laws § 19-4-3(b), the Department is authorized to share with, and to receive from, CSBS and its affiliates and subsidiaries, documents, materials and other information, including confidential examination materials, subject to maintaining any required confidentiality.

numerous accounts where Ocwen failed to make timely disbursements to pay for taxes and insurance; ongoing unlicensed servicing activity by Ocwen subsidiaries in numerous jurisdictions; and Ocwen's significantly deteriorating financial condition. The Examining States further alleged that Ocwen failed to respond to requests for information in a timely manner, including failure to provide key financial documents and reconciliations of its financial statements to regulators.

20. To attempt to address the above issues, the state regulators, including Rhode Island, and Ocwen entered into a confidential Memorandum of Understanding (MOU) on December 7, 2016, which MOU required Ocwen to perform a comprehensive audit and reconciliation of all consumer escrow accounts though Ocwen was allowed to offer an alternative plan for the audit and reconciliation.

B. **RHODE ISLAND SPECIFIC FACTS AND TRAVEL**

21. On April 20, 2017, the Department issued an Emergency Order to the Respondent Parties pursuant to R.I. Gen. Laws § 42-35-14(c).

22. The Emergency Order included the following findings, closely paraphrased:

    a. The protection of the public welfare and the integrity of the financial marketplace imperatively required emergency action pursuant to R.I. Gen. Laws § 42-35-14(c) in order to protect consumers from the harm caused by Respondents' irresponsibility, untrustworthiness, and disregard of statutory and regulatory mandates and to prevent further harm to persons who may be relying on Respondents to hold consumer funds and to effectuate future financial transactions.

    b. Respondents engaged in, were engaging in, or were about to engage in, acts or practices such that the Department was unable to conclude that Respondents have demonstrated the financial responsibility, experience, character, and general fitness to warrant the belief that the company will be operated honestly, fairly, soundly, efficiently and in the public interest in compliance with R.I. Gen. Laws § 19-14-7(b).

23. On the basis of the above findings, the Emergency Order made the following orders, quoted verbatim:

a. "Respondents shall immediately cease from acquiring new mortgage servicing rights and acquiring or originating new residential mortgages serviced by Respondents, which mortgage loans are secured by Rhode Island property, until Respondents can provide the Department with a reconcilement of its escrow accounts showing that consumer funds are appropriately collected, properly calculated, and disbursed accurately and timely."

b. "Respondents shall immediately cease acquiring mortgage servicing rights and acquiring or originating new residential mortgages serviced by Respondents, which mortgage loans are secured by Rhode Island property, until Respondents can show it is a going concern by providing a financial analysis that encompasses all of the liabilities it currently maintains, as well as liabilities it has knowledge it will incur in the course of its business."

c. "Respondents shall immediately cease and desist from any and all unlicensed activity in this State, including, without limitation, acting as a third party loan servicer."

24. On April 25, 2017, the Respondents filed a Complaint for Judicial Review of the Emergency Order in Providence County Superior Court (PC-2017-1862).

25. As of December 31, 2016, Respondents reported that they were servicing 6,422 loans secured by Rhode Island property, such loans having an aggregate unpaid principal balance of $1,045,511,167 as of such date.

## IV.   GLOBAL MINIMUM SETTLEMENT TERMS

26. Upon execution of this Consent Order, Respondent Parties will promptly take the actions described in Exhibit A, which is incorporated into this Consent Order and which consists of the "Global Minimum Settlement Terms" referenced in Paragraph 17 herein.

## V.   RHODE ISLAND THIRD PARTY SERVICER LICENSING TERMS

27. Subject to the condition precedent of the Respondents fulfilling any outstanding application requirements and subject to the continuing condition of the Respondents' compliance with the "Global Minimum Settlement Terms" outlined in Section IV above and with the remaining compliance terms in this Section V, the Department will vacate the denial of, reinstate and grant the Third Party Servicer Applications.

28. The Respondents acknowledge that the granting of the Rhode Island Third Party Servicer Applications in no way alters the restrictions in the Global Minimum Settlement Terms as to the scope of activities that can be conducted under the Third Party Loan Servicer Licenses.

29. The Respondents acknowledge that they must maintain any and all approved Third Party Loan Servicer Licenses in good standing, including timely renewal, in order to perform any third party mortgage loan servicing activity in Rhode Island.

30. By the deadline of November 1, 2017, Respondents shall provide the Department with the following information: (a) a list of all loans secured by Rhode Island property presently serviced by Respondents, including the date such loans were originated, (b) a list of all loans secured by Rhode Island property as to which Respondents are acting as a third party servicer (as defined in R.I. Gen. Laws § 19-14-1), including the date such loans were originated, and (c) a list of all pending acquisitions of servicing rights and applications for mortgage loans that would be secured by Rhode Island property that are in the pipeline.

## VI.   RHODE ISLAND GENERAL TERMS

31. This Consent Order is entered into for the purpose of resolving the issues raised in the Emergency Order without any admissions or denials, including no admission of the facts contained in this Consent Order, except for those facts deemed necessary to evidence the authority of the Department.

32. This Consent Order supersedes the prior Emergency Order in its entirety and any and all understandings associated therewith.

33. For the purposes of this Consent Order, and the requirements set forth in Exhibit A, the designated representative for the Department will be:

Sara Cabral
Supervisor of Examinations

7

Division of Banking
Department of Business Regulation
1511 Pontiac Avenue, Building 68
Cranston, RI 02920
sara.cabral@dbr.ri.gov

34. It is the responsibility of the Respondent Parties to assure that the Department's above

designated representative is notified of any change to the Respondent Parties' designated

contact for purposes of communications regarding this Consent Order, which as the time of

execution has been identified as:

Michael Hollerich
Chief Compliance Officer
16675 Addison Road
Addison, Texas 75001
michael.hollerich@ocwen.com

## VII.   RHODE ISLAND STANDARD CONSENT ORDER TERMS

35. Waiver of Administrative Hearing.  By agreeing to resolve this matter through the execution

of this Consent Order, Respondents knowingly and voluntarily waive any right to an

administrative hearing regarding the Emergency Order and this Consent Order.

36. Waiver of Superior Court Appeal.  By agreeing to resolve this matter through the execution

of this Consent Order, Respondents knowingly and voluntarily waive any right to pursue an

appeal to the Superior Court under the Rhode Island Administrative Procedures Act, R.I. Gen.

Laws § 42-35-1 *et seq.* regarding the Emergency Order and this Consent Order.  Accordingly,

Respondents will take appropriate action for dismissal of case # PC-2017-1862.

37. Enforcement.  If the Respondents fail to comply with any term or condition of this Consent

Order within any applicable time period set forth herein, the Respondents will be in violation

hereunder and the Department may take immediate and/or heightened enforcement or other

action in accordance with applicable law.  Provided Respondents comply with the terms of this

8

Consent Order, the Department will not seek additional penalties related to the allegations contained in the Consent Order or the findings of the escrow review described in Exhibit A, provided, however, nothing in the Consent Order prohibits the Department from taking administrative action on new issues discovered during the pendency of the Consent Order, or thereafter.

38. Compliance; Other Laws. Compliance with the terms of this Consent Order does not relieve the Respondents of any obligation to comply with other applicable laws or regulations administered by or through the Department or any other governmental agency.

39. Miscellaneous. This Consent Order shall be deemed entered into as of the date of execution by all parties. This Consent Order shall be binding upon Respondent's successors through a merger or sale of substantially all of Respondent's assets. This agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.

SIGNATURES ON NEXT PAGE

**NOTICE PURSUANT TO R.I. GEN. LAWS § 42-35-12**

**THIS ORDER CONSTITUTES A FINAL ACTION OF THE DEPARTMENT OF BUSINESS REGULATION PURSUANT TO RHODE ISLAND GENERAL LAWS TITLE 42, CHAPTER 35. FINAL AGENCY ACTIONS ARE GENERALLY APPEALABLE TO THE SUPERIOR COURT WITHIN THIRTY (30) DAYS OF THE DATE OF THE ACTION BY FILING A PETITION FOR REVIEW OF SAID COURT. HOWEVER, THE RESPONDENT IS HEREBY NOTIFIED THAT BY WAIVING ITS RIGHT TO A COMPLETE HEARING AND AGREEING TO THIS CONSENT ORDER, ANY SUCH RIGHT OF APPEAL HAS BEEN WAIVED.**

**For the Department:**

Signature _____   Date 9-28-17

Elizabeth K. Dwyer
Superintendent of Banking and Insurance
and Interim Director

**For OLS, OFSPL, and OMS:**

_____          9/28/2017
Signature                                        _____
                                                 Date

Timothy Hayes
Executive Vice President for OLS and OMS
Director for OFSPL

**For Ocwen Business Solutions, Inc.:**

_____     19/27/17
Signature                      Date

Patricia Ann L. Guilatco
President

**For Homeward Residential, Inc.:**

_____    9 - 28 - 17
Signature                    Date

Gregory G. O'Connor
President

13

## CERTIFICATION

I hereby certify that on this _29_ day of _September_, 2017, a copy of the executed Consent Order was sent by first class mail postage prepaid and certified mail postage prepaid to:

Ocwen Loan Servicing, LLC
1661 Worthington Road, Suite 100
West Palm Beach, Florida 33409

And via email to:

Haydn J. Richards, Esq.
Bradley
hrichards@bradley.com

John B. Daukas, Esq.
Goodwin Procter LLP
jdaukas@goodwinlaw.com

Timothy Hayes, Esq.
General Counsel
Ocwen Loan Servicing, LLC
timothy.hayes@ocwen.com

And via email to the following persons at the Department of Business Regulation:

Jenna Algee, Esq.
Deputy Chief of Legal Services

Elizabeth K. Dwyer
Superintendent of Banking and Insurance, and Interim Director

Sara Paterson Cabral
Supervisor of Examinations, Division of Banking

Pamela Toro, Esq.
Chief of Legal Services

Sara Tindall-Woodman, Esq.
Legal Counsel

14

# Exhibit A

## Global Minimum Settlement Terms

I.    MORTGAGE SERVICING RIGHTS RESTRICTION.

    a.  MORTGAGE SERVICING RIGHTS RESTRICTION. Except as set forth in paragraphs (b), (c) and (e) below, Ocwen Financial Corporation and its subsidiaries and affiliates (collectively, "Ocwen") shall not acquire any residential mortgage servicing rights (MSRs) until April 30, 2018.

    b.  REALSERVICING RESTRICTION. Ocwen shall not board any new loans onto the REALServicing platform at any time. This restriction does not apply to loans that are (i) already serviced on the REALServicing platform, including those that are subsequently modified and/or refinanced or those that are subsequently converted to an arrangement whereby Ocwen acts as sub-servicer, or (ii) required to be repurchased by Homeward Residential, Inc. or Ocwen.

    c.  NEW ORIGINATIONS.  Ocwen may originate through broker, retail, or wholesale, or acquire through correspondent lender relationships, new residential mortgage loans, including, but not limited to, traditional mortgage loans, and reverse mortgages so long as they will not be boarded, even temporarily, to the REALServicing platform. Any such loans must, instead, be sub-serviced by an unaffiliated, licensed and/or exempt entity, although Ocwen may retain the associated MSRs. Until April 30, 2018, any growth through acquisition from correspondent relationships must be limited to no more than ten (10) percent per calendar year of the total number of loans held by Ocwen at prior calendar year end.

    d.  NEW SERVICING PLATFORM. Ocwen shall develop a detailed Plan of Action and Milestones (POAM) for the transfer of all residential mortgages currently administered on the REALServicing platform to other servicing platform(s) that will enable Ocwen to comply with applicable mortgage servicing standards for its residential mortgage portfolios. The POAM shall include a timeline for accomplishing each milestone in the POAM in order to complete the transfer within a commercially reasonable time. The proposed POAM shall be submitted to the designated representative of the state regulator identified in the Consent Order ("State Regulator"). Ocwen shall provide to the designated representative quarterly updates on the POAM until the transfer of all residential mortgages has been completed.

    e.  POTENTIAL MERGER OR ACQUISITION PROVISIONS. In the event that Ocwen chooses to merge with or acquire an unaffiliated company or its assets in order to effectuate a transfer of loans from the REALServicing platform, Ocwen must give the State Regulator thirty (30) days prior notice to the signing of any final agreement and the opportunity to object within thirty (30) days from such notice. If no objection is received, the provisions of paragraph (a) above shall not prohibit the transaction, including the related transfer of MSRs or mortgage loans between the companies, or limit the transfer of loans from the

REALServicing platform onto the merged or acquired company's alternate servicing platform. In the event that an unaffiliated company merges with or acquires Ocwen or Ocwen's assets, none of the above paragraphs within this Section I shall prohibit said transaction, including the related transfer of MSRs or mortgage loans between the companies, or limit the transfer of loans from the REALServicing platform onto the merging or acquiring company's alternate servicing system.

II.     ESCROW REVIEW PROCESS.

    a.   SCOPE OF ESCROW REVIEW. Ocwen will employ an independent third-party auditor ("Auditor") to review all escrow transactions on the REALServicing platform, in a representative sample of escrowed loans serviced by Ocwen in the signatory states between January 1, 2013 and June 30, 2017, as set forth in II.c. below.

    b.   INDEPENDENT THIRD-PARTY AUDITOR.  Ocwen has generated a request for proposal ("RFP") setting forth information about the Auditor's engagement and defining the specific escrow transactions to be reviewed. The states had an opportunity to review and object to the RFP. Ocwen will select the Auditor and notify the signatory states of the proposed Auditor.  Ocwen will engage the Auditor within ten (10) days of notification to the signatory states unless the signatory states object to the Auditor. If the signatory states object, the parties will make a good faith effort to promptly resolve any objections, including potential engagement of a different entity as the Auditor.

    c.   AUDIT PLAN. The Auditor's testing methodology shall be consistent with the RFP and shall be set forth in a plan ("Audit Plan") agreed to by Ocwen and the Auditor and not objected to by the signatory states. The Audit Plan will be submitted to the signatory states within sixty (60) days of the Auditor's engagement, unless otherwise agreed to by the parties, and the states must submit any objections within ten (10) days after submission.  The Audit Plan must be completed by February 1, 2018, and the Auditor must begin testing by March 1, 2018.  The Auditor may revise the Audit Plan to the extent revisions become necessary during its testing, provided it is consistent with the RFP and provided Ocwen agrees to the revision and the signatory states do not object to the revision.

    d.   SAMPLING METHODOLOGY.

        i.   REPRESENTATIVE REVIEW. The Auditor will review a random, statistically significant sample of escrowed loans. The population of escrowed loans is limited to those where the property is located in one of the signatory states. The statistically significant sample size shall be at a 95% confidence level, 5% expected margin of error, and 2% precision

17

level. The sample of loans will be allocated on a pro-rata basis amongst the signatory states based on the percentage share for each state, with every signatory state having at least five (5) loans reviewed. If any state has less than five (5) loans sampled as a result of the pro-rata allocation, additional loans shall be sampled to ensure that each state has at least five (5) loans reviewed, but without a commensurate increase for a signatory state not subject to the minimums described above.

ii. STRATIFIED REVIEW. The Auditor will review a statistically significant sample of each of the identified strata at a 95% confidence level, 5% expected margin of error, and 2% precision level.

1. The identified strata are divided into two categories: 1) "Pro-Rata Allocation Only" and "Pro-Rata Allocation Plus."

2. The Pro-Rata Allocation Only strata are:
   a. HOA foreclosures,
   b. second liens,
   c. loans with biweekly payments, and
   d. current loans with either positive or negative escrow balances greater than $10,000.

3. The Pro-Rata Allocation Plus strata are
   a. ARMs,
   b. loans 60+ days past due,
   c. HAMP modifications,
   d. Shared Appreciation modifications (SAM loans),
   e. non-HAMP modifications,
   f. bankruptcy,
   g. loans with PMI only,
   h. loans with flood insurance,
   i. condo master policy loans,
   j. loans with negative escrow balances when transferred,
   k. loans with negative escrow balances for 3+ consecutive months,
   l. loans with borrower complaints,
   m. loans with capitalized escrow, and
   n. loans with lender placed insurance.

4. For the Pro-Rata Allocation Only strata, the Auditor will ensure the strata testing population is allocated on a pro-rata basis amongst the signatory states based on the percentage of Ocwen's overall portfolio attributable to each state.

5. For the Pro-Rata Allocation Plus strata, the pro-rata allocation will

18

be adjusted, as necessary, to ensure the Auditor reviews at least five (5) escrowed loans per strata for each signatory state.

6. To the extent the Auditor increases the Pro-Rata Allocation Plus sample to meet the minimums described above, the overall population will also increase, without a commensurate increase in the Pro-Rata Allocation Plus for a signatory state not subject to the minimums described above.

e. TESTING METHODOLOGY. In accordance with the testing methodology provisions of the RFP, the Auditor will identify instances where Ocwen did not administer an escrow account for a sampled loan in compliance with laws governing escrow under the Real Estate Settlement Procedures Act, as implemented by Regulation X, the Truth in Lending Act, as implemented by Regulation Z, the Homeowners Protection Act, and R.I. Gen. Laws § 19-9-2 related to escrow ("Error"). For each Error found, the Auditor will, to the extent the information is reasonably accessible, set forth:
  i. the name of the borrower,
  ii. the state where the property is located,
  iii. the nature of the error,
  iv. the date of the Error,
  v. the date Ocwen first became aware of the Error,
  vi. how the Error came to Ocwen's attention (internal process, third-party notification, consumer complaint, regulatory agency, etc.),
  vii. an analysis of whether the error caused financial harm, including
    1. basis for determination, and
    2. the amount of any harm.
  viii. if the Error was remediated, and, if so, how and when it was remediated.
  ix. For any unidentified or unremediated Errors, the Auditor must provide information regarding why the Error was not identified and/or remediated. During the review, the Auditor will also determine if the Error caused any financial harm to the borrower.

f. CORRECTIVE ACTIONS. If the Auditor identifies Errors previously remediated by Ocwen, regardless of whether they resulted in financial harm as defined in the Audit Plan, the Auditor will confirm that the corrective actions were sufficient to: (1) remediate the Error, and remediate any other similarly impacted borrowers, and (2) prevent the Error from recurring. Ocwen will provide the state signatory representative with documentation of any corrective actions to address any previously remediated Errors. Should the Auditor determine that Ocwen did not fully remediate the Error(s) and/or that Ocwen has not taken sufficient corrective action to prevent the Error(s) form recurring, then Ocwen shall submit within 60 days of Escrow Report a corrective action plan (including remediation if applicable) to be approved by the state signatory representative. If the Auditor identifies a non-remediated Error, Ocwen shall submit within 60 days of Escrow Report a corrective

action plan to be approved by the state signatory representative that will remediate the Error, and remediate any other similarly impacted borrowers, including the provision of restitution to fully correct financial harm, and/or to prevent the Error from recurring. In the event Ocwen implements remediation to address a non-remediated Error, the Auditor will review a statistically valid sample of borrowers potentially impacted by each root cause to confirm the remediation efforts were successfully completed. In all instances, the Auditor will confirm that Ocwen's corrective action plans and remediation efforts are sufficient and no loan shall be boarded onto a new system pursuant to the POAM with a known, unremediated error.

g. ESCROW REPORT. The Auditor will generate a report setting forth the results of its audit ("Escrow Report"), pursuant to the timeframes agreed upon in the Audit Plan. The Escrow Report will identify any information that, in the Auditor's opinion, is relevant to its report. At a minimum, the Escrow Report will include the information described in Paragraphs II.(d)-II.(f) of this Agreement. The final report, and any drafts, shall be provided simultaneously to Ocwen and the signatory states. Ocwen shall have the right to submit written comments to the Auditor, which shall be appended to the final version of the Escrow Report.

III.   COMPLAINT PLAN

a.   No later than sixty (60) days after this Consent Order is issued by the State Regulator, Ocwen shall submit to the State Regulator for review and determination of non-objection a comprehensive consumer complaint resolution plan ("Complaint Plan") designed to ensure that the company will properly document, timely investigate and remediate consumer complaints as defined in 12 CFR 1024.35. The Complaint Plan shall include, at a minimum:

   i.   robust, board-approved policies and procedures to ensure that all consumer complaints are documented and timely investigated, any errors found as a result of a complaint are remediated, and errors found that may impact other accounts are escalated for further investigation and/or remediation;
   ii.   a formal internal review process to ensure all complaints are processed in accordance with the policies and procedures adopted under this Complaint Plan;
   iii.   training on revised complaint procedures for all employees no later than 180 days from the date of this order;
   iv.   a program establishing annual, mandatory complaint resolution training for employees who may receive any form of complaint from a consumer or are otherwise involved in the complaint resolution process; and
   v.   detailed steps for addressing each action required by the Complaint Plan.

IV.   FINANCIAL CONDITION.

20

a. ONE YEAR FINANCIAL CONDITION PLAN. Within thirty (30) business days, Ocwen will submit a written plan demonstrating how it will remain a going concern for a period of one (1) year from the Effective Date of this Order ("One-Year Financial Condition Plan"). The One-Year Financial Condition Plan, at a minimum, must take into account, in accordance with Generally Accepted Accounting Principles, all known and reasonably anticipated future liabilities including, but not limited to, costs of necessary audits and anticipated regulatory, law enforcement, or other litigation liabilities or costs exceeding one (1) million dollars arising from any final orders/judgments or settlements and must also demonstrate how Ocwen will comply with all applicable liquidity and capital requirements.

b. THREE YEAR FINANCIAL CONDITION PLAN. Ocwen previously submitted to the MMC a three (3) year financial condition plan ("Three-Year Financial Condition Plan"), which must be updated by Ocwen on or before September 30, 2017 and each signatory state shall receive a copy of the updated report.

c. ONGOING FINANCIAL CONDITION REPORTING. Ocwen will provide additional updates every six (6) months going forward for a period of three (3) years, unless a signatory state releases Ocwen from this requirement earlier. Ocwen shall notify each signatory state if and when any event occurs that could materially impact Ocwen's financial condition, including, but not limited to, any actual or anticipated liabilities or costs exceeding five (5) million dollars or if Ocwen drops below or projects to drop below any applicable liquidity or capital requirement, within ten (10) business days of the occurrence of any such event(s). Ocwen will submit the following reports with the One-Year Financial Condition Plan, and Ocwen will continue to submit these reports for a period of three (3) years and one (1) month from the Effective Date of this Agreement:

    i. Monthly financial statements that track actual earnings compared to forecasted earnings during the same time period, to be submitted to each signatory state for each month on or before the last day of the following month;

    ii. A monthly liquidity report that demonstrates daily liquidity tracking with forecasts on liquidity positions over thirty (30), sixty (60), and ninety (90) days, to be submitted to each signatory state on or before the fifteenth (15th) day of each month;

    iii. A monthly report documenting compliance with internal policies and procedures governing limits on exposure to market risk, including, but not limited to, interest rate risk, to be submitted to each signatory state for each month on or before the last day of the following month; and

    iv. A quarterly going concern analysis, which shall include covenant and capital reporting that tracks any and all financial or regulatory covenants Ocwen is obligated to comply with and whether Ocwen remains in compliance with those covenants, to be submitted to each signatory state forty-five (45) days after the end of each calendar quarter, with the exception of the last quarterly report for each calendar year, which shall be submitted

ninety (90) days after the end of such quarter.

d.  ACKNOWLEDGEMENT OF RECEIPT. Each signatory state will designate a point of contact to whom Ocwen will submit the documents described in Section IV of this Agreement.  Such person must acknowledge receipt of the documents within fifteen (15) calendar days of Ocwen's submission.  In addition, the signatory states will identify any alleged deficiencies in the reports within sixty (60) calendar days of Ocwen's submission.  The parties will make a good faith effort to promptly resolve any alleged deficiencies.

e.  RELEVANT ENTITY.  Ocwen will submit the documents described in Section IV of this Agreement for Ocwen Financial Corporation.